Berry GORDY, Plaintiff–Appellant,

v.

The DAILY NEWS, L.P.; George Rush; Tony Turner, Defendants–Appellees.

No. 95–55102.

United States Court of Appeals, Ninth Circuit.

Argued and Submission Deferred March 7, 1996.

Resubmitted March 11, 1996.

Decided Sept. 9, 1996.

As Amended Oct. 28, 1996.

Deborah Drooz, Langberg, Cohn & Drooz, Los Angeles, CA, for plaintiff-appellant.

R. Bruce Rich, Lee Dranikoff, Weil, Gotshal & Manges, New York City; Eve B. Burton, The Daily News, L.P., New York City; Amanda Johnston, Troop, Meisinger, Steuber & Pasich, Los Angeles, CA, for defendants-appellees.

Before CANBY, BOOCHEVER and LEAVY, Circuit Judges.

CANBY, Circuit Judge:

We are presented with the recurring question of where a newspaper and its writer can be sued for the alleged publication of a libel. Berry Gordy, a resident of California and the

founder of Motown Records, brought a defamation action in California against The New York Daily News and columnist George Rush for a column published about Gordy in the Daily News.[1] The Daily News and Rush removed the action from Los Angeles Superior Court to federal district court, which dismissed the action for lack of personal jurisdiction over the defendants. We reverse.

## I. Background

The jurisdictional facts in this case are undisputed. Gordy is founder and former president of Motown Records. He has lived in California for twenty-four years and most of his friends, family, and business associates reside in California.

The Daily News, which published the allegedly defamatory statements about Gordy, is a newspaper based in New York. More than 99% of the circulation of the Daily News occurs within 300 miles of the New York metropolitan area. The Daily News does not contract with or employ distributors, or solicit subscriptions, in California. Nevertheless, a small but regular circulation of the Daily News reaches California. The Daily News circulates 13 copies of its daily edition and 18 copies of its Sunday edition to subscribers in California. This California circulation of the Daily News is approximately 0.0017% of the paper's total circulation.

Although the Daily News primarily covers events that occur in New York, the features and columns in the Daily News deal with subject matter that is of nationwide interest, such as entertainment news. Because of its considerable emphasis on the entertainment industry, the Daily News frequently sends reporters to California. The paper also gathers news from stringers,[2] anonymous sources, and news services in California.

Rush, a newspaper columnist, is a citizen, resident, and domiciliary of New York. He researched and wrote the article in question in New York. Before publication of the article, Rush authorized his associate, Michael

Riedel, to telephone Gordy in California to obtain his response. Riedel purportedly also made telephone calls to two other persons in California while researching the story, to confirm it; the sources were guaranteed confidentiality. Riedel has many California sources in addition to the two he contacted regarding the Gordy article.

The events reported in the allegedly defamatory article did not take place in California, nor did the article mention California.

## II. Specific Jurisdiction

California's long-arm statute extends jurisdiction to the limits imposed by the Due Process Clause. *See* Cal.Civ.Proc. Code § 410.10; *Ziegler v. Indian River County,* 64 F.3d 470, 473 (9th Cir.1995). "Because the jurisdictional facts are undisputed in this case, the constitutional limits on personal jurisdiction are reviewed de novo." *Casualty Assurance Risk Ins. Brokerage Co. v. Dillon,* 976 F.2d 596, 599 (9th Cir.1992). Due process requires that the defendants have certain "minimum contacts with [the forum]." *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945).

In this appeal Gordy does not argue that the Daily News or Rush has sufficient contacts with California to subject either one to general jurisdiction there, regardless of the subject of the lawsuit. He contends instead that they had sufficient contacts related to his defamation claim to confer specific jurisdiction over them for the purpose of that claim. In determining whether a non-resident defendant may be subjected to specific jurisdiction, we have long iterated three requirements:

(1) The nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws. (2) The claim must

---

**1.** Gordy sued The Daily News, L.P., the owner of The New York Daily News. Both entities will be referred to collectively as the Daily News. In addition, Gordy brought the action against Tony Turner, who is no longer a party to the litigation.

**2.** Stringers are writers who submit stories to the newspaper and are paid for the copy that is accepted.

be one which arises out of or results from the defendant's forum-related activities. (3) Exercise of jurisdiction must be reasonable.

*Data Disc, Inc. v. Systems Technology Assocs., Inc.,* 557 F.2d 1280, 1287 (9th Cir.1977); *see also Ballard v. Savage,* 65 F.3d 1495, 1498 (9th Cir.1995) (repeating formulation).

### A. Contact With the Forum

■ The first requirement undergoes a certain amount of distortion when jurisdiction is based on an intentional act committed outside the forum that has intended effects within the forum. It is difficult to see how such a foreign actor "invoke[s] the benefits and protections of [the forum's] laws." *Data Disc,* 557 F.2d at 1287. Yet we have recognized that a foreign act with forum effects can confer jurisdiction over a defendant who has never physically entered the forum. *Haisten v. Grass Valley Medical Reimbursement Fund, Ltd.,* 784 F.2d 1392, 1399 (9th Cir.1986). We have also recognized that this concept is an expansive one, to be applied with caution, especially in an international context. *See Pacific Atl. Trading Co. v. M/V Main Express,* 758 F.2d 1325, 1330 (9th Cir. 1985). The touchstone is whether the "defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). The requisite connection, however, need not involve physical entry into the forum. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985).

■ In our case, the Daily News published a column allegedly defaming Gordy, knowing that he lived in California, and it distributed presumably from 13 to 18 copies of the defamatory article in California. Rush wrote the column with the same knowledge. Is their conduct and connection with California sufficient to confer specific jurisdiction over them in that forum?

The closest case to the present one is the Supreme Court's decision in *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). In that case the plaintiff was a California domiciliary who was libeled by the National Inquirer, which had a circulation of 600,000 in California. She sued in California the reporter who wrote the story and his editor. The reporter wrote the story in Florida and made a few telephone calls to California in connection with the story. The editor lived in Florida and had no relevant contact with California apart from editing the story.

The Supreme Court held that California had jurisdiction over the two defendants. It noted that the article concerned California and caused most of its damage in California; jurisdiction was therefore proper because of the effects of the defendants' Florida conduct in California. *Id.* at 788–91, 104 S.Ct. at 1486–87. The Court rejected the defendants' argument that they were simply like welders of a product that a manufacturer distributes nationally.

> Whatever the status of their hypothetical welder, petitioners are not charged with mere untargeted negligence. Rather, their intentional, and allegedly tortious, actions were expressly aimed at California. Petitioner South wrote and petitioner Calder edited an article that they knew would have a potentially devastating impact upon respondent. And they knew that the brunt of that injury would be felt by respondent in the State in which she lives and works and in which the National Enquirer has its largest circulation. Under the circumstances, petitioners must "reasonably anticipate being haled into court there" to answer for the truth of the statements made in their article.

*Id.* at 789–90, 104 S.Ct. at 1487 (quoting *World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. at 567). The Court recognized that the contacts of the writer and editor "with California are not to be judged according to their employer's activities there," and that "[e]ach defendant's contacts with the forum State must be assessed individually." *Id.* at 790, 104 S.Ct. at 1484. This fact was of no avail to the writer and editor, however:

> In this case, petitioners are primary participants in an alleged wrongdoing intentionally directed at a California resident,

and jurisdiction over them is proper on that basis.

*Id.*

From these statements of the Supreme Court, one might reasonably conclude that *Calder* is dispositive that jurisdiction exists in our case, and, ultimately, we conclude that it is. Rush and the Daily News wrote and published their allegedly defamatory column intentionally directing it at Gordy, a California resident. We cannot stop there, however, for we have placed some glosses on *Calder.*

In *Casualty Assurance Risk Insurance Brokerage Co. v. Dillon,* 976 F.2d 596 (9th Cir.1992), we were presented with a claim by a Guam corporation that it had been defamed by the Insurance Commissioner of Indiana in letters the Commissioner sent to health care providers. No letters had been sent to Guam, because the Guam corporation did not solicit business in Guam. The Guam corporation insisted that it could sue the Commissioner in Guam under *Calder,* because the Commissioner's defamatory letter was an intentional injury to the corporation in Guam. In rejecting the contention, we said that *Calder* had noted that the large circulation of the National Enquirer would cause the brunt of the injury to be felt in California. Therefore, we said, "the circulation of the defamatory material in the forum state is an important factor in the minimum contacts analysis for a defamation action." *Dillon,* 976 F.2d at 599.

Rush and the Daily News seize upon this statement, and urge a need for far more circulation in California than the 13 daily and 18 Sunday newspapers the Daily News distributes there. But the statement in *Dillon* must be viewed in the context of the facts of that case. There had been *no* distribution of the alleged libel in Guam. "The only 'effect' on Guam was that the business reputation of a Guam corporation was harmed in other jurisdictions." *Id.* An additional factor in refusing jurisdiction in *Dillon* was the extreme unreasonableness of requiring the defendant to litigate in as distant a location as Guam. *Id.* at 600.

Similar considerations governed in *Core-Vent Corp. v. Nobel Industries AB,* 11 F.3d 1482 (9th Cir.1993), in which we held that publication of a commercial libel in a worldwide medical journal did not permit suit against Swedish writers in California. Our primary ground for so ruling was that it would have been unreasonable for the writers to be required to be sued in California, *id.* at 1487, but we also expressed doubt that the defamation was truly targeted at California when the purported target was a corporation that did a worldwide business. "A corporation does not suffer harm in a particular geographic location in the same sense that an individual does." *Id.* at 1486.

Here, there was targeting in a manner that was lacking in *Dillon* and *Core-Vent.* The prime targeting arises, of course, from the fact that Gordy is an individual who lives in California, not a corporation incorporated there and doing business either elsewhere or everywhere. We have no desire to republish the alleged libel, but it was of a nature that clearly would have a severe impact on Gordy as an individual. It is reasonable to expect the bulk of the harm from defamation of an individual to be felt at his domicile. *See Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 780, 104 S.Ct. 1473, 1481, 79 L.Ed.2d 790 (1984). Targeting also occurs because the Daily News regularly distributes from 13 to 18 copies of its publication in California, and the defamatory column contained in those copies causes harm in California.

Rush and the Daily News would have us disregard the factor of Gordy's domicile in California and concentrate alone on the small circulation in California. They point out that, in permitting Hustler Magazine to be sued in New Hampshire, the Supreme Court relied on "monthly sales of thousands of magazines" that "cannot by any stretch of the imagination be characterized as random, isolated, or fortuitous." *Id.* at 774, 104 S.Ct. at 1478. Rush and the Daily News argue that the Daily News' circulation in California was not solicited by the Daily News and was therefore "random, isolated, or fortuitous." *Id.* We are not convinced.

First, mailing to regular subscribers, even though few, is not random or fortuitous and is not even necessarily isolated. Surely if

some New York entity had written only 13 defamatory letters and sent them all to California, we would permit a defamed California resident to sue the entity in California. It is not clear why the distribution of 13 to 18 defamatory copies of a column loses magnitude as a contact simply because the Daily News does a lot of other things elsewhere.[3]

Second and most important, in deciding how much of any connection is enough, we deal with the entire picture: "a categorical approach is antithetical to *Calder*'s admonishment that the personal jurisdiction inquiry cannot be answered through the application of a mechanical test but instead must focus on the relationship among the defendant, the forum, and the litigation within the particular factual context of each case." *Core–Vent,* 11 F.3d at 1487. Either 13 or 18 subscriptions are enough to count as a connection when distributed in the state where the target is domiciled and will suffer most from damage to his reputation. In *Keeton,* on the other hand, the Supreme Court was dealing with a forum with which the plaintiff had no connection at all except the desire to bring suit there; the Court permitted the suit because Hustler Magazine regularly distributed thousands of magazines in the. state. *See Keeton,* 465 U.S. at 780–81, 104 S.Ct. at 1482.

Rush and the Daily News contend, however, that we have recognized a *de minimis* rule regarding newspaper publication that requires distribution considerably in excess of 13 to 18 copies to permit specific jurisdiction. They rely on two cases that preceded *Calder: Church of Scientology v. Adams,* 584 F.2d 893 (9th Cir.1978), and *Demaris v. Greenspun,* 712 F.2d 433 (9th Cir.1983). *Church of Scientology* is easily distinguished. It involved the publication by the St. Louis Post–Dispatch of allegedly defamatory articles about the Church of Scientology. Circulation of two of these articles in California was 156 copies and 121 copies. The California Church of Scientology attempted to sue the newspaper in California. We held that we would not subject the publisher to "personal jurisdiction *solely* because an insignificant number of copies of their newspapers

were circulated in the forum state." *Church of Scientology,* 584 F.2d at 897 (emphasis added). We were careful to point out, however, that the articles had not been directed against the California Church, but against the Scientology movement everywhere and that "there [was] serious doubt that the articles refer to the appellant." *Id.* at 899. In short, the California plaintiff was not targeted.

*Demaris* is more difficult to distinguish. There a California plaintiff sought to sue the Las Vegas Sun and its publisher in California. We refused to permit jurisdiction based on 447 weekly and 935 Sunday papers that found their way into California either by casual sales or subscription. We pointed out, however, that the alleged libel concerned the plaintiff in his capacity as writer of exposes of criminal activities in certain cities; two of his books focused on Las Vegas, Nevada. *Demaris,* 712 F.2d at 434. The primary impact of the story thus was in Nevada, and the libel appeared to relate to the plaintiff's business. We also did say, however, that "we are not disposed to carry the jurisdiction beyond the area of the paper's primary circulation." *Id.* To the extent that this statement is to be read as an inflexible rule, we think that its force has been modified by the subsequent Supreme Court decisions of *Keeton,* 465 U.S. at 775, 104 S.Ct. at 1478–79, which held that a publisher could be sued in a forum where "only a small portion" of its copies were distributed, and *Calder,* 465 U.S. at 790–91, 104 S.Ct. at 1487–88, which held that a writer and editor could be subjected to jurisdiction for targeting a California plaintiff, even though the publisher's contacts with the state could not be attributed to them. We must keep in mind that we are applying a long-arm statute that reaches to the maximum extent permitted by the Due Process Clause. We conclude that, under the Supreme Court's approach in *Keeton* and *Calder,* the California contacts of Rush and the Daily News are sufficient.

## B. Relation Between the Claim and Defendant's Activities

■ There is little doubt that Gordy's claim arises out of the forum-related activi-

---

**3.** First Amendment considerations attending the publishing of a newspaper do not enter into the jurisdictional analysis. *Calder,* 465 U.S. at 790, 104 S.Ct. at 1487.

ties of Rush and the Daily News. As we have explained, a major forum-related activity was the writing of the alleged libel in New York that had a tortious effect on Gordy in California. With regard to that activity, the connection to Gordy's claim is total.

The other significant activity is the regular distribution of 13 daily and 18 Sunday newspapers to subscribers in California.[4] There, too, the newspapers necessarily published the libel for which Gordy sues. But for the distribution of those newspapers, a part of Gordy's reputational injury would not have occurred. *See Ballard,* 65 F.3d at 1500.

We are satisfied, therefore, that Gordy meets the requirement of connection between his claim and the defendants' forum-related activities. In so ruling, however, we do not adopt Gordy's overly expansive view of the nature of such a connection. Many of the contacts Gordy asserts, such as the general news gathering techniques of the Daily News and Rush, derivation of advertising revenue in California, and contribution to a pension plan administered in California, are not sufficiently related to his defamation claim. *See Church of Scientology,* 584 F.2d at 896–97 (newspaper publisher's revenues from California advertisers are not sufficient basis for specific jurisdiction in California because "advertising revenues are unrelated to appellant's action for libel"). Because Gordy asserts specific jurisdiction, we consider only those "forum-related activities as they relate to the specific cause of action." *Forsythe v. Overmyer,* 576 F.2d 779, 782 (9th Cir.), *cert. denied,* 439 U.S. 864, 99 S.Ct. 188, 58 L.Ed.2d 174 (1978). In this case, the important forum-related activity is the circulation of an allegedly libelous column, the effect of which was felt in California.

### C. Reasonableness of Exercise of Jurisdiction

■ Once we have decided that defendants have the requisite minimum contacts and that the plaintiff's claim arises out of them, defendants "must 'present a *compelling case* that the presence of some other

considerations would render jurisdiction unreasonable.'" *Ballard,* 65 F.3d at 1500 (quoting *Burger King,* 471 U.S. at 477, 105 S.Ct. at 2185 (emphasis added by *Ballard*)). In evaluating reasonableness, we are admonished to consider seven factors. *Ziegler,* 64 F.3d at 475 (listing the factors).

It is interesting to note the origins of this seven-factor test. In *Insurance Co. of North America v. Marina Salina Cruz,* 649 F.2d 1266, 1270 (9th Cir.1981), we made the following commendable statement:

There is no mechanical or quantitative test for jurisdiction under the *International Shoe* reasonableness standard, and we shall not attempt to list all the factors that might, in a different case, be part of an assessment of the reasonableness of subjecting a defendant to jurisdiction. For purposes of the present case we conclude that the following seven factors are relevant: [listing].

*Id.* (citations omitted). This unassailable and flexible approach then evolved by degrees through *Taubler v. Giraud,* 655 F.2d 991, 994 (9th Cir.1981), where we stated that these factors had been found relevant in *Insurance Co. of North America* and "[s]ome of these factors are also relevant here," and *Raffaele v. Compagnie Generale Maritime,* 707 F.2d 395, 398 (9th Cir.1983), where we said that our cases had noted seven factors that "may be pertinent" and then went through each one. In *Olsen by Sheldon v. Government of Mexico,* 729 F.2d 641, 649 (9th Cir.), *cert. denied,* 469 U.S. 917, 105 S.Ct. 295, 83 L.Ed.2d 230 (1984), we proceeded to "consider the relative significance of each factor and balance them all." By the time of *Paccar International, Inc. v. Commercial Bank of Kuwait, S.A.K.,* 757 F.2d 1058 (9th Cir.1985), we simply say:

In analyzing the reasonableness of exercising jurisdiction, we apply seven factors: [listing and citing *Insurance Co. of North America* ]

*Id.* at 1065. In *Decker Coal Co. v. Commonwealth Edison Co.,* 805 F.2d 834, 840 (9th

---

4. The use of California sources to check on an article is an additional significant activity but our decision does not depend on that factor.

Cir.1986), we say that "[t]hese seven factors *together determine* whether 'under the totality of the circumstances the defendant could reasonably anticipate being called upon to present a defense in a distant forum.'" (citation omitted) (emphasis added). Then, in *FDIC v. British–American Insurance Co.,* 828 F.2d 1439, 1442 (9th Cir.1987), we state that "[e]ach factor will be analyzed below and balanced into the reasonableness inquiry." In *Roth v. Garcia Marquez,* 942 F.2d 617, 623 (9th Cir.1991), we say that "[s]ince none of these factors is dispositive, we *must balance* the seven." (emphasis added). Then, in *Core–Vent,* 11 F.3d at 1487, we state the formulation as it remains today; in determining reasonableness of the exercise of jurisdiction:

> we must consider seven factors: [listing]. None of the factors is dispositive in itself; instead, we must balance all seven. [Citation]. We consider each factor in turn.

This is essentially the formulation reiterated in *Terracom v. Valley National Bank,* 49 F.3d 555, 561 (9th Cir.1995), and *Ziegler,* 64 F.3d at 475.

■ Thus did a flexible recital of the factors that happened to be present in *Insurance Co. of North America* evolve into the seven-factor test that we are asked to apply. Returning to the spirit of *Insurance Co. of North America,* we point out why we think it is reasonable in this case to require Rush and the Daily News to come to California and defend.[5] Rush and the Daily News knew that Gordy lived in California when they allegedly defamed him; they had good reason to expect that a substantial impact of their actions would be felt in California; they are in a business in which they deal with California matters regularly; the Daily News sends reporters to California; and the Daily News serves subscribers in California, though they are few.[6]

It is true that Gordy could sue in New York, but "[a]n individual injured in California need not go to [New York] to seek redress from persons who, though remaining in [New York], knowingly cause the injury in California." *Calder,* 465 U.S. at 790, 104 S.Ct. at 1487. Moreover, "California maintains a strong interest in providing an effective means of redress for its residents tortiously injured." *Sinatra v. National Enquirer, Inc.,* 854 F.2d 1191, 1200 (9th Cir.1988). We conclude that Rush and the Daily News have not made a compelling case that litigating in California would render jurisdiction unreasonable. *See Ballard,* 65 F.3d at 1500.

### III. Conclusion

By publishing an allegedly defamatory article the effects of which would clearly be felt in California, and by regularly circulating newspapers in California, Rush and the Daily News purposefully availed themselves of the privilege of conducting activities in California. Gordy's claim arises from those activities. The Daily News and Rush have not made a compelling case that litigating in California would be unreasonable. The order of the district court granting defendants' motion to dismiss for lack of personal jurisdiction is therefore

**REVERSED.**

---

5. Even if we applied the 7-factor test of *Core–Vent,* the result would be the same.

6. We recognize that these considerations of reasonableness duplicate to a large degree the analysis that led us to conclude that the California contacts of Rush and the Daily News were sufficient. Such duplication is inevitable, at least in the case of the distant tortfeasor, because the contacts with the forum are sufficient if they "are such that he should *reasonably* anticipate being haled into court there." *World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. at 567 (emphasis added). Considerations of reasonableness thus infuse the inquiry concerning sufficiency of contacts. Perhaps that is why the Supreme Court simply considered reasonableness and sufficiency of contacts together in *Calder,* 465 U.S. at 788–90, 104 S.Ct. at 1486–87, rather than trying to analyze them as separate prongs of a test.