**Johnnie L. COCHRAN, Jr., Plaintiff,**

v.

**NYP HOLDINGS, INC. and Andrea Peyser, Defendants.**

**No. CV–97–9086 KMW (CTX).**

United States District Court, C.D. California.

Aug. 3, 1998.

Barry B. Langberg, Stroock Stroock & Lavan, Los Angeles, CA, for Johnnie L. Cochran, Jr., plaintiff.

Robert S. Gutierrez, Leopold Petrich & Smith, Los Angeles, CA, Slade R. Metcalf, Charles J. Glasser, Squadron Ellenoff Plesent & Sheinfeld, New York City, for NYP Holdings Inc. and Andrea Peyser, defendants.

## MEMORANDUM OF DECISION AND ORDER

WARDLAW, District Judge.

In this defamation action, plaintiff Johnnie L. Cochran ("Cochran") complains about the statement, published in a column by defendant Andrea Peyser ("Peyser") in the New York Post, "[b]ut history reveals that he [Cochran] will say or do just about anything to win, typically at the expense of the truth," a reference to Cochran's representation of O.J. Simpson in his murder trial. The saga of O.J. Simpson—from his days as a national football hero, to the riveting slow speed chase of the white Ford Bronco, through his acquittal in the criminal trial televised "gavel-to-gavel" nationwide, to the announcement of the civil jury verdict which almost diverted national media coverage from the 1997 State of the Union address—has been the subject of singularly wide-ranging public debate. Almost every aspect of the murders of Nicole Brown Simpson and Ronald Goldman and the ensuing criminal and civil trials has been dissected and analyzed by legal and non-legal commentators, talk show hosts, and millions of individuals over dinner tables and water coolers. The accompanying media onslaught has spawned television programs and personalities, and numerous books and articles by those connected with the trials, including interested observers, prosecuting and defense attorneys and witnesses, as well as Cochran himself. A highly controversial trial, the criminal case implicated issues of national public interest and concern—fallen heroes and celebrity murder, race relations, police investigatory procedures and attitudes, the

criminal justice system itself. Cochran emerged as the leader of the Dream Team that successfully defended O.J. Simpson in the criminal trial. Simpson's acquittal sparked nationwide debate over Cochran's trial strategy and the issue of jury nullification, and generated further discussion of Simpson's responsibility for the deaths of Nicole Brown Simpson and Ron Goldman, which only intensified when the civil jury found Simpson liable for their wrongful deaths.

The Louima incident, distant from the Simpson events in time and geography, but not in national consciousness, generated yet another public discussion of race and police techniques, and, at the time of the defamatory statement alleged here, presented the likelihood of another controversial trial of immense public import. The New York Post column containing the statement about which Cochran complains concerns the potential intersection of these two highly charged and controversial trials at the point where O.J. Simpson's defense lawyer appeared to be joining Louima's civil rights litigation team. The gist of Peyser's column is that she did not think it wise for Louima to permit Cochran to join his legal team. In so opining, Peyser merely joined the chorus of public voices on the subject of the Simpson criminal trial. It is against this backdrop that the extent of First Amendment protection for the two sentences at issue must be analyzed.

As a preliminary matter, defendants request this Court to dismiss the action for lack of personal jurisdiction or to transfer the case to the Southern District of New York; but, more to the point, they then urge that Peyser's statement is nonactionable opinion because it cannot reasonably be read to imply an assertion of objective fact. Having fully considered the issues presented by these motions, all papers and evidentiary materials filed by and the oral argument of counsel, the Court is prepared to rule and, for reasons more fully explained below, hereby **DENIES** defen-

dants' motions to dismiss for lack of personal jurisdiction and to transfer venue, and **GRANTS** defendants' motion to dismiss for failure to state a claim. In the end, the Court concludes that no one can mistake Peyser's column for anything more than an elucidation of her opinion that Cochran, in view of his defensive strategy in the Simpson case, should not participate in the Louima trial. All are free to disagree with her views about Cochran's trial strategy and O.J. Simpson's responsibility for his ex-wife's death, but Peyser's right to express her opinion on the subject is absolutely protected by the First Amendment.

## I. BACKGROUND

This action arises out of a newspaper column written by Peyser and published in the New York Post ("NYP") (the "column").[1] Co-defendant New York Post Holdings ("NYPH") publishes the NYP. Plaintiff is a nationally known attorney who, amidst much notoriety, successfully defended O.J. Simpson against murder charges arising from the deaths of Simpson's wife, Nicole Brown Simpson, and her friend Ron Goldman. The column comments generally on Cochran's imminent joinder onto the legal team representing Abner Louima, a Haitian immigrant who was allegedly tortured by Brooklyn police officers. Its theme is that Louima, a sympathetic plaintiff, would weaken his otherwise strong case by allowing Cochran, a "legal scoundrel[ ]," to join his team. The only statement in the column that Cochran alleges is defamatory is the following:

> Cochran has yet to speak up. But history reveals that he will say or do just about anything to win, typically at the expense of the truth.

The complaint alleges that when read in the context of the entire column, these statements imply that Cochran has a record of lying and unethical conduct. At oral argument, however, plaintiff's counsel made clear, and defendants' counsel con-

---

1. The column is attached to this Order as Appendix A.

curred, that the word "history" in the alleged defamatory statement was to be read no more broadly than to refer exclusively to Cochran's representation in the O.J. Simpson criminal trial.[2]

Before the Court are three motions by defendants. First, defendants move to dismiss under Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction. Next, they seek to transfer the case to the Southern District of New York pursuant to 28 U.S.C. § 1404(a), contending that it would be a more convenient forum. Finally, defendants move to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim, on the ground that the alleged defamatory statement is nonactionable opinion. Cochran opposes each of these motions. The Court first considers the motions to dismiss and transfer venue, and finding each without merit, next considers whether the statement is actionable.

## II. JURISDICTION

### A. Personal Jurisdiction is Proper.

■ This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a). Defendants assert, however, that this Court lacks personal jurisdiction. The Court need not address whether it has general jurisdiction over defendants, because it plainly has specific jurisdiction consistent with Constitutional due process requirements. See International Shoe Co. v. State of Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Where a defendant has not had continuous and systematic contacts with the state sufficient to establish general jurisdiction, the Ninth Circuit determines whether the defendant has sufficient minimum contacts with the forum to confer specific jurisdiction by applying the following three-part test:

(1) The nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws.

(2) The claim must be one which arises out of or results from the defendant's forum-related activities.

(3) Exercise of jurisdiction must be reasonable.

Gordy v. Daily News, L.P., 95 F.3d 829, 831–32 (9th Cir.1996). In this case, all three prongs are satisfied.

### 1. Purposeful Availment.

Defendants have purposefully availed themselves of the forum state, having "performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state." Sher v. Johnson, 911 F.2d 1357, 1362 (9th Cir.1990) (citation omitted). The NYP is distributed primarily in the New York City metropolitan area. Defendants admit that on August 29, 1997, the date the column was published, the Post's daily sales were 458,289 copies, at least 210 of which were sold in California through the NYP's California distributor, Mader News, Inc. An additional 72 copies of the NYP are regularly delivered to California subscribers. In the context of alleged defamatory publications, the Ninth Circuit has found California jurisdiction on the basis of a mere 13 to 18 copies of defendant's New York magazine mailed to California subscribers. See Gordy, 95 F.3d at 833. In so doing, it stated that purposeful availment may consist simply of "mailing to regular subscribers ... even though few, [because that

---

**2.** Plaintiff's counsel stated that the "whole article ... make[s] it clear that the incident in history that Ms. Peyser is referring to, I'm quoting from the article itself here 'Cochran dazzles a Los Angeles jury into buying his fantasy tale of city wide police conspiracy in order to set free a celebrity who slaughtered his ex-wife.'" Reporter's Transcript of Pro-

ceedings ("Tr.") at 18:10–16; see also Tr. at 19:17–19; 26:21–25 (further representations that "history" refers to police conspiracy theory of Simpson's defense). Defense counsel concurred, stating that he "accept[ed] plaintiff's contention that it ["history"] refers to the O.J. case." Tr. at 9:17–19.

activity] is not random or fortuitous and is not even necessarily isolated." *Id.* Although Peyser did not contact any persons in California, send any letters into California in connection with writing the column, or travel to California for any purpose, she is subject to personal jurisdiction. A "foreign act with forum effects can confer jurisdiction over a defendant who has never physically entered the forum," where the "touchstone is 'whether the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" *Id.* at 832 (citations omitted).

The Ninth Circuit has held that the most important factor in considering purposeful availment in this context is the harmful effect of the defamatory statement, which occurs in the forum of an individual's domicile. *See Gordy,* 95 F.3d at 832–33. Cochran is a California resident of at least fifty years who owns two homes in Southern California. He holds a California driver's license, files taxes bearing his California address, has cars registered in California, and is registered to vote in California. He is active in Los Angeles in a variety of professional, community service, and charitable endeavors. The harmful effects of any defamatory statement made about Cochran would be felt by him most acutely in Los Angeles.

A further factor to be considered is whether the reporter knew that the subject of the column lived in the forum. *See id.* at 831–32. Even though Cochran now maintains a Manhattan apartment in which he lives part-time to accommodate his New York television show "Cochran and Company," Peyser's column suggests on its face that she knew Cochran hailed from Los Angeles. She makes several references to "East Coast" as opposed to "West Coast" events and ends her column by pronouncing, "[t]his is not L.A." Therefore, that Peyser now finds herself in a Los Angeles court cannot be the result of "'random,' 'fortuitous,' or 'attenuated' contacts or of the 'unilateral activity of another party or a third person.'" *Burger King Co. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (citations omitted).

Finally, the Ninth Circuit has held that the subject matter of the alleged defamatory statement contributes to purposeful availment if the statement is a comment on an event that occurred in the forum. *See Core–Vent .Corp. v. Nobel Indus. AB,* 11 F.3d 1482, 1486 (9th Cir.1993). Here, the subject of the alleged defamatory statement was Cochran's handling of the defense in the O.J. Simpson criminal trial, which occurred in California. Therefore, the Court finds that defendants have performed affirmative conduct which "allow[ed] or promote[d] the transaction of business within the forum state." *Sher,* 911 F.2d at 1362 (citation omitted).

**2. Relation Between the Claim and Defendants' Contacts.**

There is little doubt that plaintiff's claim arises out of the forum-related activity of the NYP, and the publication and distribution of the column in this state. As the *Gordy* court explained, "a major forum-related activity was the writing of the alleged libel in New York that had a tortious effect on [the plaintiff] in California. With regard to that activity, the connection to [plaintiff's] claim is total." 95 F.3d at 835. This element is therefore satisfied.

**3. Reasonableness of the Exercise of Jurisdiction.**

 Once the court concludes that a defendant purposefully established minimum contacts with a forum state, and that the claims at issue arise from those contacts, the court must determine whether the assertion of personal jurisdiction would comport with "traditional notions of fair play and substantial justice." *International Shoe,* 326 U.S. at 316, 66 S.Ct. 154 (citation omitted). A court "presume[s] that an otherwise valid exercise of specific jurisdiction is reasonable." *Ballard v. Savage,* 65 F.3d 1495, 1500 (9th Cir.1995).[3]

**3.** Factors that the Court must balance in de-

termining the reasonableness of exercising

To avoid jurisdiction, the defendant must "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* (citation omitted).

Defendants have not met their burden of presenting other considerations that would make it unreasonable for the Court to assert jurisdiction. Defendants have purposefully injected themselves into the forum by regularly selling substantial numbers of copies of the NYP to California subscribers and on California newsstands through their California distribution system. Cochran resided in California at the time the column was published. Defendants have not asserted an unreasonable burden of defending in the forum, save that of traveling here. Finally, "California maintains a strong interest in providing an effective means of redress for its residents tortiously injured." *Gordy,* 95 F.3d at 836 (citation omitted). Therefore, the exercise of personal jurisdiction is reasonable, and defendants' motion to dismiss on this ground is denied.

**B. The convenience of parties and witnesses does not require transfer of this action.**

 Defendants next move to transfer this action to the Southern District of New York pursuant to 28 U.S.C. § 1404(a). That section provides: "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Such transfer is discretionary with the court. *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988). The primary factors to be considered are convenience of witnesses and parties and concerns for judicial econ-omy (including duplicative effort, waste of time and money). *See* Schwarzer, Tashima, and Wagstaffe, *California Practice Guide: Federal Civil Procedure Before Trial* § 4:267–71 (1998) [hereinafter "Schwarzer § ___"]. The moving party has the heavy burden of showing that the convenience of parties and witnesses, and the interests of justice, favor such transfer and must demonstrate clearly that the balance of inconvenience weighs in its favor. Schwarzer § 4:297. Rather than relying on "vague generalizations" of inconvenience, the moving party must demonstrate, through affidavits or declarations containing admissible evidence, who the key witnesses will be and what their testimony will generally include. *See Commodity Futures Trading Comm'n v. Savage,* 611 F.2d 270, 279 (9th Cir.1979); *E & J Gallo Winery v. F. & P. S.p.A.,* 899 F.Supp. 465, 466 (E.D.Cal.1994); *see also* Schwarzer § 4:301. The plaintiff's choice of forum is ordinarily given great deference, unless plaintiff is a non-resident or the forum lacks any real contacts with the action. *See* Schwarzer § 4:281–284; *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 255–56, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) (citation omitted).

 In this case, though venue is proper in New York and the action could have been brought there, defendants do not even attempt to satisfy with the requisite specificity their heavy burden of showing that a transfer is preferable. They broadly state that "most of the relevant witnesses that would be called upon to provide testimonial evidence and any documentary evidence that relate to Peyser's Column are located in New York." These witnesses are identified only as "any employees of NYP Holdings who worked on

jurisdiction include the extent of defendant's purposeful interjection into the forum state's affairs, the burden on defendant in defending in the forum, the extent of conflict with the sovereignty of the defendant's state, the forum state's interest in adjudicating the dispute, the most efficient judicial resolution of the controversy, the importance of the forum to plaintiff's interest in convenient and effective relief, and the existence of an alternative forum. *Core–Vent,* 11 F.3d at 1487–88. The Ninth Circuit has recently indicated that a strict recital of these seven factors is not required where, as here, a general reasonableness analysis is conducted. *See Gordy,* 95 F.3d at 835–36.

the Column," and, presumably, Peyser. This description utterly fails the particularity requirement set forth in *Commodity Futures, supra.* Nor do defendants assert that their witnesses would be unable to travel to California to defend suit here, or demonstrate that the convenience of parties and witnesses, and the interests of justice, favor such transfer. In this case, either plaintiff and his witnesses will travel to New York, or Defendants and their witnesses will travel to California. A transfer will not be ordered if the result is merely to "shift" the inconvenience from one party to another. Schwarzer § 4:297.

The only factor that even slightly weighs in favor of transfer is that plaintiff is temporarily residing part-time in New York City; thus the inconvenience to him in prosecuting there might be somewhat less than defendants' inconvenience in defending here. The Court, however, considering the strong presumption in favor of plaintiff's choice of forum, finds that, in the end, defendants do not satisfy the requirement of "clearly demonstrating" that the balance of inconvenience weighs in their favor. The motion to transfer venue is therefore denied.

## III. THE ALLEGED DEFAMATORY STATEMENT IS NONACTIONABLE OPINION.

Defendants ask the Court to dismiss the complaint pursuant to Rule 12(b)(6). This rule is an appropriate mechanism for raising the question whether plaintiff states a claim for defamation, or whether the alleged defamatory statement is nonactionable opinion. *See Dodds v. American Broadcasting Co., Inc.,* 145 F.3d 1053, 1065 (9th Cir.1998); *Church of Scientology of California v. Flynn,* 744 F.2d 694, 696 (9th Cir.1984). Although the existence of defamatory meaning is "generally a question of fact for the jury," *Church of Scientology,* 744 F.2d at 696, a

court may properly determine whether a statement is fairly susceptible of a defamatory meaning when presented with a motion to dismiss. *See Dodds,* 145 F.3d 1053, 1065 (affirming district court's dismissal of defamation action under Rule 12(b)(6) upon finding statements to be nonactionable opinion); *accord Polygram Records, Inc. v. Superior Court,* 170 Cal.App.3d 543, 551, 216 Cal.Rptr. 252 (1985) (same on challenge to the pleadings).[4] In considering a motion to dismiss:

> [the] court's inquiry is not to determine if the communications may have an innocent meaning but rather to determine if the communication reasonably carries with it a defamatory meaning.... Just as the court must refrain from a 'hairsplitting analysis' of what is said in an article to find an innocent meaning, so must it refrain from scrutinizing what is not said to find 'a defamatory meaning which the article does not convey to a lay reader.'

*Church of Scientology,* 744 F.2d at 696 (citation omitted); *accord Couch v. San Juan Unified School District,* 33 Cal. App.4th 1491, 1500, 39 Cal.Rptr.2d 848 (1995) (whether a statement is "reasonably susceptible of an interpretation which implies a provably false assertion of fact—the dispositive question in a defamation action—is a question of law for the court"). Therefore, the Court must first "decide whether the statement in question is capable of the defamatory meaning ... ascribe[d] to it.... To discern whether a statement has a defamatory meaning, [it is] interpret[ed] from the standpoint of the average reader, ... judging the statement not in isolation, but within the context in which it is made." *Norse v. Henry Holt & Co.,* 991 F.2d 563, 567 (9th Cir.1993) (citations omitted). Considering the statement in the context of the column as a whole, and interpreting it from the point of view of an average reader, the Court finds that

---

4. Federal law, rather than state law, sets the standard for dismissal under Fed.R.Civ.P. 12(b)(6). *Church of Scientology,* 744 F.2d at 696 n. 2. Because the issue before the Court in this diversity case is whether the complaint states a cause of action under California defamation law, however, "the standard for dismissal in state court is highly relevant." *Id.*

the statement is reasonably capable of sustaining the meaning urged by plaintiff: that he "made up the police conspiracy theory" during O.J. Simpson's criminal trial "to save the guilty O.J. Simpson."

■ To defeat the motion to dismiss, plaintiff must show that the statement is reasonably capable of sustaining a defamatory meaning, and is not comment within the ambit of the First Amendment. *See Dodds*, 145 F.3d 1053, 1065 (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990)). In *Milkovich*, Chief Justice Rehnquist, writing for the majority, traced the history of the "fair comment" defense, which emerged from a concern that defamation laws might stifle public debate, and discussed the significant constitutional protections that have developed since *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The Court stopped short, however, of creating "still another First Amendment-based protection for defamatory statements which are categorized as 'opinion' as opposed to 'fact.'" *Milkovich*, 497 U.S. at 17, 110 S.Ct. 2695. Instead, the Court held that the threshold question is whether a reasonable fact finder could conclude that the statement is "sufficiently factual to be susceptible of being proved true or false." *Id.* at 21, 110 S.Ct. 2695.

■ The Ninth Circuit has been fairly consistent in setting forth and applying the standard for evaluating the threshold question, ruling that a statement may sustain a defamatory meaning only upon a showing that "a reasonable juror could conclude that the allegedly defamatory implications constituted provably false assertions of fact." *Dodds*, 145 F.3d 1053, 1065; *see also Underwager v. Channel 9 Australia*, 69 F.3d 361, 366–67 (9th Cir.1995); *Partington v. Bugliosi*, 56 F.3d 1147, 1153 (9th Cir.1995). "Pure opinions," by contrast, are protected, and consist of those statements that "do not imply facts capable of being proved true or false." *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1053 n. 2 (9th Cir.1990), *cert. denied*, 499 U.S. 961,

111 S.Ct. 1586, 113 L.Ed.2d 650 (1991). To determine whether a statement implies a factual assertion, the totality of the circumstances in which the statement was made must first be examined. *Underwager*, 69 F.3d at 366. This includes "the statement in its broad context, [including] the general tenor of the entire work, the subject of the statements, the setting, and the format of the work." *Id.* Second, the court must consider the "specific context and content of the statements, analyzing the extent of figurative or hyperbolic language used and the reasonable expectations of the audience in that particular situation." *Id.* Finally, the court considers whether the "statement itself is sufficiently factual to be susceptible of being proved true or false." *Id.*

### 1. Broad Context

■ The Court first considers the statement in the broad context in which it was made, including the general tenor of the entire work. The general tenor of Peyser's column is a critique of Cochran's handling of the high-profile O.J. Simpson criminal trial and her concern that his tactics, if imported into Louima's case, would hinder rather than advance Louima's position. The column's very first sentence, "[b]eware of lawyers bearing gifts," is a cautionary one, setting the tone for the remainder of the column. Peyser obviously views "lawyers bearing gifts" with suspicion, and is particularly skeptical of Cochran's visit to Louima in Brooklyn Hospital to deliver an autographed copy of his memoir, *Journey to Justice*. She sarcastically notes the "less than pleasant" result of "this innocent-looking transaction" being Cochran's boarding Louima's team. This account of the meeting between Cochran and Louima strikes the tone for the remainder of the column, as Peyser concludes, "the man who cynically turned West Coast justice on its ear in the service of the guilty is now poised to do a similar number on the city of New York."

The subject of the alleged defamatory statement is Cochran's handling of the Simpson criminal defense. No person involved in this case contends that the words "history reveals" refer to anything other than the O.J. Simpson criminal trial at which Cochran served as lead defense counsel. Indeed, the column itself refers to no other part of Cochran's "history." Identifying that history, Peyser specifically references the defense's police conspiracy theory, writing that Cochran "dazzled a Los Angeles jury into buying his fantasy tale of a citywide police conspiracy, in order to set free a celebrity who slaughtered his ex-wife.... In the case of O.J. Simpson, Cochran exploited fears of police brutality ... to concoct a scenario in which O.J. was the victim."

The facts underlying the subject of the alleged defamatory statement are disclosed in the column and are not themselves alleged to be defamatory. The Ninth Circuit has held that "when a speaker outlines the factual basis for his conclusion, his statement is protected by the First Amendment." *Partington*, 56 F.3d at 1156; *see also Dodds* at 1067 (an opinion "based on an implication arising from disclosed facts is not actionable when the disclosed facts themselves are not actionable"); *Yagman*, 55 F.3d at 1439 ("A statement of opinion based on fully disclosed facts can be punished only if the stated facts are themselves false and demeaning."). The *Partington* court affirmed this principle in a case which similarly involved comment on two controversial and well-publicized murder trials, in which one co-defendant won an acquittal but another was convicted. The court noted that where the facts in question were subject to numerous and varied interpretations and had · created public excitement precisely because the same facts resulted in opposite verdicts, the alleged defamatory statements were protected. Because they were based on facts available to both the writer and the reader, they implied only the writer's interpretations of the publicly known facts. *Id.* at 1154. As the Ninth Circuit also stated in *Yagman:*

> '[A]n opinion which is unfounded reveals its lack of merit when the opinion-holder discloses the factual basis for the idea'; readers are free to accept or reject the author's opinion based on their own independent evaluation of the facts.

55 F.3d at 1439 (citation omitted); *accord Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir.1993) ("[I]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable.").

█ Here, as plaintiff concedes, the subject of the alleged defamatory statement is Cochran's defense of Simpson and the use of the police conspiracy theory which led to Simpson's acquittal, to which Peyser expressly and repeatedly refers throughout the column. Peyser does not even hint that her opinion is based on any additional, undisclosed facts not known to the public. *Cf. Milkovich*, 497 U.S. at 9 n. 3, 110 S.Ct. 2695 (author's assertion of unique knowledge of facts not known to his readers contributed to the implication that the statements conveyed those facts). The O.J. Simpson criminal trial, including litigation of the police conspiracy theory, was televised live to the public, widely viewed, and has been thoroughly critiqued and debated in the public arena.[5] As a result, there exists a shared public knowl-

---

5. Of the overwhelming deluge of publicity attendant to and extensive public discussion of the O.J. Simpson criminal trial, the Court takes judicial notice. This is appropriate because the overall notoriety and widespread coverage of this trial is generally known within the territorial jurisdiction of this Court. *See, e.g., Ritter v. Hughes Aircraft Co.*, 58 F.3d 454, 458–59 (9th Cir.1995) (approving judicial notice of layoffs at Hughes Aircraft Co. as a fact that would be generally known in Southern California and capable of sufficiently accurate and ready determination). *See also Mack v. South Bay Beer Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir.1986) (on motion to dismiss, court may consider matters that may be judicially noticed pursuant to Federal Rule of Evidence 201).

edge of the trial proceedings, theories, and underlying factual allegations. Because the factual referent is disclosed, "readers will understand they are getting the author's interpretation of the facts presented; they are therefore unlikely to construe the statement as insinuating the existence of additional, undisclosed facts." *Yagman,* 55 F.3d at 1439.

It is undisputed that the setting of the alleged defamatory statement is a column in a major metropolitan newspaper. The column is located within the first five pages of the paper, which, in the NYP, generally contain opinion columns authored by one of the NYP's three or four regular columnists. Peyser is a regular columnist for the NYP who writes "very opinionated" columns about "various political matters." Though the column did not appear on a specifically-designated "editorial page," that her columns generally set forth her personal views on topical matters and regularly appear on approximately the same page of the newspaper creates a setting denoting opinion as opposed to fact.

The column is formatted as opinion rather than as a standard news article. It is inset with the author's photograph, and her name appears in large, bold lettering. Thus the author's persona is highlighted, eclipsing, if not sharing, the spotlight on the story itself. By contrast, a straightforward NYP news article would contain a "normal byline" containing the reporter's name in type the same size as the article's text, and no photograph of the reporter. Moreover, rather than bearing a headline that simply communicates the information that Cochran was joining Louima's legal team, the title blares "Nightmare Team is Taking Over," an obvious allusion to the "Dream Team," as O.J. Simpson's criminal defense team was widely known. Finally, above the column are two photographs captioned not with factual descriptions of the pictured parties, but with more comment—one of Cochran, captioned, "HERE'S JOHNNIE: Johnnie Cochran wants to use his successful defense of O.J. Simpson to work his way onto Abner Loui-

ma's legal team," and one of Peter Neufeld, a DNA expert in the Simpson criminal trial, captioned, "PETER NEUFELD: Helped O.J. get off."

According to the column, Louima's "alleged torture and humiliation at the hands of Brooklyn cops has united every community in the city with a sense of shared outrage." This broad context makes clear that the alleged defamatory statement is only further elucidation of Peyser's opinion that the Louima trial team should not welcome Cochran's participation. The statement cannot reasonably be understood as anything more than Peyser weighing in on the public debate over the Louima case and its impending collision with the Simpson saga, which she apparently hopes to avert. *See McCabe v. Rattiner,* 814 F.2d 839, 843 (1st Cir.1987) ("In the context of public debate over a matter of community concern, first person narrative articles relating to that matter are commonly understood to be attempts to influence that public debate.").

### 2. Specific Context

The Court next turns to the specific context in which the statement was made. Even where the broad context is one of opinion, it is possible that a particular statement may imply an assertion of objective fact and thus constitute actionable defamation. *Partington,* 56 F.3d at 1155. However, where the language used is "loose, figurative [and] hyperbolic," this tends to negate the impression that a statement contains an assertion of verifiable fact. *See Milkovich,* 497 U.S. at 21, 110 S.Ct. 2695.

The specific context of a statement shades its meaning. For example, in *Standing Comm. on Discipline v. Yagman,* 55 F.3d 1430, 1440 (9th Cir.1995), the Ninth Circuit considered attorney Stephen Yagman's statement that a United States District Court judge was "dishonest." The court weighed this allegation "in [the] context" of "a string of colorful adjectives Yagman used to convey the low esteem in

which he held [the judge]" (including "ignorant," "ill-tempered," a "bully," a "buffoon," a "sub-standard human," and "one of the worst judges in the United States"). The court found that the collection of terms used together created a "context of ... 'lusty and imaginative expression[s]'" which conveyed "nothing more substantive than Yagman's contempt for [the judge]," and rendered the allegation "dishonest" merely a statement of "rhetorical hyperbole, incapable of being proved true or false." *Id.* (citation omitted).[6]

Similarly, here, the specific context is a collection of opinions, colorfully expressed, which renders the statement at issue simply more rhetorical hyperbole. Peyser describes Cochran as "the man who dazzled a Los Angeles jury into buying his fantasy tale of a citywide police conspiracy, in order to set free a celebrity who slaughtered his ex-wife," and in doing so "cynically turned West Coast justice on its ear." She calls Cochran and his "Nightmare Team" "legal scoundrels," hints at the risk of Louima's case becoming a "political or media circus," opines that "Louima's future in this city, and ours, can only be harmed by the like [sic] of Cochran," and concludes that "Louima deserves better." No one argues that this series of "lusty and imaginative expressions" is anything other than opinion, and Cochran alleges none to be defamatory of him. As a result, the alleged defamatory statement conveys nothing more substantive than Peyser's contempt for Cochran and his trial tactics.

Peyser's language is loose, figurative and hyperbolic. Plaintiff's counsel argues that the words "history reveals" refer specifically and exclusively to the "fantasy tale" of the police conspiracy. Tr. at 19:15–19. By linking "history reveals" to the "fantasy" sentence, plaintiff concedes away the factual predicate of the alleged defamation. The "fantasy" sentence is itself a figurative, hyperbolic, non-factual

rendering of Peyser's opinion of the Simpson criminal defense theory. Peyser does not, as defendants' brief aptly notes, describe literal situations of Cochran "blinding" the jurors nor causing them to "buy" his theory of the defense; nor can the abstract concept of justice literally be "turned on its ear." Peyser's allegation that Cochran and his associates are "legal scoundrels" is also merely figurative, as it is a general way of conveying her opinion that they are "shady practitioners." *See Yagman*, 55 F.3d at 1440 (citing *Lewis v. Time*, 710 F.2d 549 (9th Cir.1983) (holding that use of phrase "shady practitioner" to describe lawyer was nonactionable opinion where the article set forth the facts upon which the opinion was based)).

The very statement alleged to be defamatory is loose and figurative. Unlike in *Milkovich* (alleged perjury in a judicial proceeding) and *Unelko* (statement product "didn't work"), the statement, "he will say or do just about anything to win, typically at the expense of the truth," does not have any concrete reference, but represents Peyser's prediction based on Cochran's defensive strategy in the Simpson trial, that Cochran *will* do anything to win, presumably in the Louima case. The statement is no more than a sweeping generalization that such a tactic will be at the expense of some amorphous, greater truth. Use of the word "typically" only underscores the hyperbole because Peyser does not identify any specific element of the police conspiracy theory asserted to be untruthful.

Moreover, Peyser uses a rhetorical device—the word "but"—in the statement[7] which, in the specific context, further supports the conclusion that the statement is nonactionable opinion. "But" is a conjunction that is used to connect coordinate elements and signify contradiction. *See Webster's Ninth New Collegiate Dictio-*

---

**6.** Though this case involved an appeal from an attorney misconduct sanction, the court interpreted and applied principles of defamation law. *Yagman*, 55 F.3d at 1438.

**7.** "Cochran has yet to speak up. *But* history reveals that he will say or do just about anything to win, typically at the expense of the truth." (emphasis added).

*nary* 190 (1987). Peyser's use of the conjunction "but" signifies the contradiction of her stated views with whatever Cochran might say on the subject if he were "to speak up."

Finally, the audience for this column would reasonably expect the alleged defamatory statement to constitute Peyser's opinion, tucked in as it is, among numerous other statements of opinion in a recognizable opinion column. Given the backdrop of commentary on both the Simpson trials and the Louima trauma, moreover, any reasonable reader would expect that this columnist is simply weighing in on the juxtaposition of the Simpson and Louima cases, and that the statement at issue is simply one aspect of her opinion on that subject.

### 3. Susceptibility of Being Proven True or False

The Court last considers whether the statement is susceptible of being proven true or false. In this case, the Court must determine whether an attorney's defense theory is an objective, provable fact. Relying on *Unelko*, Cochran argues that it is, and that his method of proof would entail showing that the police conspiracy theory was true and that he did not deceive the Simpson jury.

*Unelko*, however, is inapposite. There, *60 Minutes* commentator Andy Rooney stated that Rain–X, a rain repellent product, "didn't work." This type of statement is provably true or false because a product can be tested objectively to determine whether it performs the functions that it claims to perform—rain repellent either is or is not invisible on one's windshield, it does or does not increase all-around visibility, and rain either does or does not disperse on contact. *See Unelko*, 912 F.2d at 1055. A statement that a product "didn't work," therefore, is "an articulation of an objectively verifiable event." *Unelko*, 912 F.2d at 1055.

This Court finds the Ninth Circuit's analysis in *Underwager* more persuasive. There, an attorney stated that a psycholo-gist had been "lying" when he testified that his qualifications were "never in question." In fact the psychologist's proposed expert testimony was deemed inadmissible due to the absence of peer review which indicated a lack of scientific community acceptance. *Underwager*, 69 F.3d at 367. The *Underwager* court found the statement nonactionable because it did not imply a verifiable assertion of perjury. The court explained that the term "lying" "applies to a spectrum of untruths, including 'white lies,' 'partial truths,' 'misinterpretation,' and deception.' " *Id.* As a result, the court held that the statement was "no more than nonactionable 'rhetorical hyperbole, a vigorous epithet used by those who considered [the appellant's] position extremely unreasonable.' " *Id.* (citing *Milkovich*, 497 U.S. at 17, 110 S.Ct. 2695).

Here, Peyser's statement can be read as no more than a comment on Cochran's trial strategy. Peyser does not opine that Cochran lied (compare *Underwager*, finding statement nonactionable opinion even where it alleged that plaintiff was "lying"), or committed perjury (as in *Milkovich*) during the Simpson trial. Unlike the statements in *Milkovich* and *Unelko*, the statement commenting upon Cochran's trial strategy is not provably true or false because there is no core of objective evidence upon which this Court could verify the allegation. In *Milkovich*, one could compare two sets of sworn testimony by plaintiff to make a determination of perjury. In *Unelko*, one could test the product. Here, the Court can do neither. Cochran's defense strategy presumably was predicated on the facts known and available to him at the time from which he was able to formulate a cohesive theory of his client's defense. This "theory" may never prove true or false, and, at most, can only be said to have persuaded the Simpson jury of a reasonable doubt. As the *Partington* court noted, "there is a wide variation in opinion concerning the appropriate trial strategy that should be pursued in a given circumstance.... Reasonable minds can and do differ as to what strategy should be adopted in a trial, particularly in a trial

before a jury. Indeed, what may be a good strategy before one jury may be a disastrous one before another." 56 F.3d at 1158.

In *Partington* the Ninth Circuit specifically reserved the question of whether a suggestion that a lawyer had committed "a serious ethical breach" would be protected by the First Amendment. *Id.* at 1158 n. 15. The court distinguished such an allegation from a criticism of "strategic choices made during a trial," holding that the latter are "generally not actionable because they are incapable of being proved true or false." *Id.* This Court need not reach that question because Peyser's statement cannot reasonably be read as an allegation that Cochran committed a serious ethical breach. At most it conveys that Cochran performed well the role of a criminal defense lawyer—successfully developing a theory to explain the facts and tell a logical story to absolve his client. It is necessarily a matter of opinion and judgment (and perhaps a subject of attorney-client privilege) whether the facts in the hands of the Simpson criminal defense team adequately supported the police conspiracy theory developed, advanced, and, ultimately accepted by the jury at that trial. Read in conjunction with Peyser's opening comments that Cochran's trial strategy was designed "to set free a celebrity who slaughtered his ex-wife," that Peyser states this strategy was at the "expense of the truth" is obviously based upon Peyser's personal opinion—not alleged to be defamatory by Cochran—that O.J. Simpson is in fact responsible for the death of Nicole Brown Simpson. That Cochran distilled his defense theory into a slogan ("If it doesn't fit, you must acquit,") that may be perceived by some to have wrongly resulted in a defense verdict, is quintessentially a proper subject of fair comment.

## IV. CONCLUSION

Based on the foregoing analysis, a reasonable fact finder could not conclude that the statement at issue is "sufficiently factual to be susceptible of being proven true or false." *Milkovich*, 497 U.S. at 21, 110 S.Ct. 2695. As opinion, the statement is absolutely protected by the First Amendment and cannot serve as the basis for a defamation claim. Therefore, plaintiff fails to allege a defamatory statement, a threshold element of a claim for defamation. Because there is no set of facts outside the column itself that could support a claim for defamation, defendants' motion is **GRANTED** and the complaint is dismissed with prejudice.

APPENDIX A

**HERE'S JOHNNIE:** Johnnie Cochran wants to use his successful defense of O.J. Simpson to work his way onto Abner Louima's legal team. *N.Y. Post: Michael Norcia*

**PETER NEUFELD**
Helped O.J. get off.

# Nightmare Team is taking over

BEWARE of lawyers bearing gifts.

Last Saturday, Johnnie Cochran strolled into Brooklyn Hospital carrying a parcel.

It was a copy of his book, "Journey to Justice" — a memoir from the man who dazzled a Los Angeles jury into buying his fantasy tale of a citywide police conspiracy, in order to set free a celebrity who slaughtered his ex-wife.

Cochran autographed the book and delivered it into the hands of Abner Louima. And Louima, whose alleged torture and humiliation at the hands of Brooklyn cops has united every community in this city with a sense of shared outrage, "was very pleased," his lawyer Brian Figeroux was telling me yesterday.

The result of this meeting is less than pleasant. For with this innocent-looking transaction, Cochran was on board Louima's team. Which means just one thing: The man who cynically turned West Coast justice on its ear in service of the guilty is now poised to do a similar number on the city of New York.

Cochran, who's been lobbying Louima's lawyers for a piece of the injured man's multimillion-dollar civil case against the city, is staging an East Coast reunion of key members of the Nightmare Team that freed O.J. Simpson.

He's recruited Barry Scheck and Peter Neufeld. The two DNA "experts" whose greatest claim to fame was staring at conclusive blood evidence of Simpson's guilt. And lying about it in a court of law.

What possible benefit could be derived from having these legal scoundrels step behind a man so overwhelmingly sympathetic, so clearly deserving compensation, a first-grader would likely have little trouble negotiating a sizable settlement on his behalf?

**ANDREA PEYSER**

A clue was offered by Figeroux — a Trinidad-born attorney who's forged an uneasy alliance with white lawyer Sanford Rubenstein, whom Louima's family had picked to handle the civil case. When I asked Figeroux about the risk of turning this horrible case into a political or media circus, he replied.

"It's already political. It's already a media circus.

"Police brutality — in terms of policing the police ... the chief police officer, you might say, is the mayor. That's where the buck stops.

"He's not fulfilling his responsibility of safeguarding all the residents of New York City. He has to be held accountable for his actions and inaction."

Louima is probably the last man in New York to refrain from turning his senseless beating and torture into a campaign issue rather than a search for justice.

It couldn't last.

This week, the Village Voice reported on a rift between friends and relatives of Louima. One faction reportedly wants Rubenstein, an experienced personal-injury lawyer with strong ties to the Haitian community, to retain control of the case.

Others are said to want Figeroux and his partner, Carl Thomas — and Cochran and Co. by extension — to run hot and furious with it.

Rubenstein insists he's staying with Louima, though he issued a curious "no comment" on anything to do with Cochran.

But his approach to the case seems vastly different than that of his cohorts.

While Figeroux is ready to condemn city authorities — all the way to the mayor's office — for abetting police brutality, Rubenstein doesn't go quite so far.

"Not only police officers but police supervisors as well often turn a blind eye to evidence of unnecessary force," he said. "These attitudes breed, protect, justify brutality."

Cochran has yet to speak up. But history reveals that he will say or do just about anything to win, typically at the expense of the truth.

In the case of O.J. Simpson, Cochran exploited fears of police brutality — culminating in the Rodney King beating — to concoct a scenario in which O.J. was the victim. The damage this nonsense has done to legitimate police officers will be felt for years.

But in New York, Abner Louima — remember, he's the *victim* — doesn't need to resort to lies to win his case. What's more, he can only benefit by seeing divisions between cops and the Haitian community become mended, not exacerbated. Louima's future in this city, and ours, can only be harmed by the, like of Cochran.

Louima deserves better. He deserves to see the guilty punished, to receive compensation for his injuries, and to hear some assurance that what happened to him won't happen again to anyone else.

Most of all, he deserves to see the truth come out.

And so do the rest of us.

This is not L.A.