Elizabeth BALLARD, Plaintiff–Appellant,

v.

Michael E. SAVAGE, et al., Defendants,

and

Royal Trust Bank (Austria),
Defendant–Appellee.

No. 93–56724.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 10, 1995.

Decided Sept. 15, 1995.

Philip H. Stillman, Flynn, Sheridan & Tabb, Rancho Santa Fe, CA, for plaintiff-appellant.

Amy D. Hogue, Pillsbury, Madison & Sutro, Los Angeles, CA, for defendant-appellee.

Before: HALL and LEAVY, Circuit Judges, and MICHAEL R. HOGAN *, District Judge.

CYNTHIA HOLCOMB HALL, Circuit Judge:

We are called upon to decide whether the district court had personal jurisdiction over an Austrian bank. The district court granted a motion to dismiss under Fed.R.Civ.P. 12(b)(2) for lack of jurisdiction. We reverse.

## I.

Appellant Elizabeth Ballard ("Ballard") brought this class action lawsuit on behalf of herself and other victims of an alleged Ponzi scheme in which investors were promised a $10 million return for every $5,000 they invested. Known as the "Savage Program" after its founder and chief perpetrator Michael Savage, the bogus scheme took in millions of dollars before its eventual demise.[1] This action represents Ballard's effort to recover some of the money she and her fellow victims lost.

Only one defendant to Ballard's class action is involved in this appeal. That defendant is Royal Trust Bank ("Royal" or the "Bank"), an Austrian bank headquartered in Vienna. Ballard alleges in her complaint that Royal was a knowing participant in the Savage Program. According to Ballard, the Bank's role in the scheme was to take the ill-gotten money and hide it in Austria where it would remain beyond the reach of the American legal process when the fraud surfaced. She claims that Royal, among other things, lent its good name to the scheme to mislead investors into believing that Mr. Savage was running a legitimate business. For proof, she points to documents on Royal letterhead touting the Savage Program as a legitimate business venture. She also claims that Royal refunded $12,000 to a disgruntled investor from its own checking account at National Westminster Bank in New York. That Royal used its own funds to pay the refund presumably tends to show that Royal actively helped to cover the criminal tracks of Michael Savage and his cohorts.

Not surprisingly, Royal paints a very different picture of this case and its involvement in the Savage Program. It admits a limited relationship with Michael Savage, but claims that it was at most an innocent repository of funds generated by a criminal enterprise. It denies any allegation that it participated in the scheme to defraud American investors. As for the documents on Royal letterhead, the Bank claims that Mr. Savage forged them without its knowledge. Royal also points out that it assisted federal author-

---

* Honorable Michael R. Hogan, Chief United States District Judge for the District of Oregon, sitting by designation.

1. Mr. Savage was the subject of a successful criminal prosecution in the Northern District of California. *See United States v. Savage*, CR–93–10667.

ities in the criminal investigation of Mr. Savage and even sent an employee to testify against him at trial. Royal further notes that it never has been charged with any wrongdoing by American or Austrian authorities.

The dispute over Royal's involvement in the Savage Program was never resolved. In the very early stages of the litigation, the district court granted Royal's motion under Fed.R.Civ.P. 12(b)(2) to dismiss the case against it for want of personal jurisdiction. A final judgment dismissing the case was entered pursuant to Fed.R.Civ.P. 54(b). Ballard appeals the dismissal, arguing that the district court had both general and specific jurisdiction over the defendant Bank. We have jurisdiction of her appeal pursuant to 28 U.S.C. § 1291.

## II.

Many of the jurisdictional facts of this case are disputed, but this much is clear. Royal is an Austrian Bank organized and regulated under Austrian law.[2] Its principal place of business is in Vienna. It has no offices or employees in the United States, nor does it generally advertise or solicit business here. Royal does, however, depend on the United States for a substantial amount of its business. In 1992–93, for example, 3,500 of its approximately 5,700 depositors (some 60 percent) were U.S. residents or had U.S. mailing addresses. Royal also regularly extends loans to customers in the United States; in the most recent time period for which figures are available, approximately 13 percent of Royal's outstanding loans were held by U.S. residents.[3] The aggregate dollar value of these loans ranged from a low of $3.3 million in 1988 to a high of $7.5 million in 1990. It appears that these loans are negotiated in Austria, governed by Austrian law, and fully collateralized by assets located in Austria. Royal has therefore argued that it "should never have to file suit [in the United States]

in order to collect on the loans or otherwise enforce [its] rights" with respect to these loans.

Although Royal claims not to advertise in the U.S., it admits that it does send prospective U.S. customers information about the Bank at their request. Royal also admits that it at least occasionally solicits new business from its existing U.S. customers by sending them promotional materials along with their regular account statements. In addition, Royal employees appear to be frequent visitors to the United States. Between 1989 and 1993, Royal officials made at least 24 separate business trips to the United States and California to meet with customers, attend conferences and seminars, and the like.

Royal also maintains brokerage accounts in New York and New Jersey. It uses these accounts to trade millions of dollars per year in the U.S. securities markets. It also has "correspondent accounts" at several U.S. banks. The parties dispute the purpose of these accounts, but it seems clear that at least one purpose is to simplify Royal's banking relationship with its U.S. customers. For example, an individual in Los Angeles who in 1991 wished to make a deposit in his Royal account could have walked down to a local branch of Union Bank, deposited $100,000 in Royal's correspondent account there, and had the money quickly posted to his account at Royal.

The question we must address is whether these contacts are sufficient to support an exercise of personal jurisdiction over Royal. The district court answered that question in the negative. Unfortunately, however, it made no factual findings to support its decision. Instead of holding an evidentiary hearing at which the parties could hash out the facts, the district court elected to consider

---

2. Royal is owned and operated by Royal Trustco, Ltd., a Canadian company that operates several banks in Austria, Canada, Great Britain, and other foreign countries.

3. According to Royal, all of its loans to U.S. customers are so-called "Lombard loans" and

are fully secured by assets within the Bank's control. The purpose of a Lombard loan is to allow a customer to make a cash investment through the Bank without having to sell a certificate of deposit before its maturity date or unload securities at an inopportune time.

the motion to dismiss on the basis of the written materials submitted by the parties.

When a district court acts on a defendant's motion to dismiss under Rule 12(b)(2) without holding an evidentiary hearing, the plaintiff need make only a prima facie showing of jurisdictional facts to withstand the motion to dismiss. *See Pacific Atlantic Trading Co. v. M/V Main Exp.,* 758 F.2d 1325, 1327 (9th Cir.1985); *Data Disc, Inc. v. Systems Technology Assos.,* 557 F.2d 1280, 1285 (9th Cir.1977). That is, the plaintiff need only demonstrate facts that if true would support jurisdiction over the defendant. *Data Disc,* 557 F.2d at 1285. We review de novo the district court's determination that Ballard failed to make a prima facie case of jurisdiction.

### III.

We begin with the question of specific jurisdiction. We use a three-part test to determine whether the district court may exercise specific jurisdiction over a nonresident defendant:

> (1) The nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections[;] (2) [t]he claim must be one which arises out of or results from the defendant's forum-related activities[; and] (3) [e]xercise of jurisdiction must be reasonable.

*Omeluk v. Langsten Slip & Batbyggeri A/S,* 52 F.3d 267, 270 (9th Cir.1995) (quoting *Data Disc,* 557 F.2d at 1287). We treat each requirement in turn and conclude that each is satisfied.

### A.

An exercise of specific jurisdiction is appropriate only if the nonresident defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 2183–84, 85 L.Ed.2d 528 (1985) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958)). We have held that the "purposeful availment" requirement is satisfied if the defendant has taken deliberate action within the forum state or if he has created continuing obligations to forum residents. *See Hirsch v. Blue Cross, Blue Shield of Kansas City,* 800 F.2d 1474, 1478 (9th Cir.1986). "It is not required that a defendant be physically present within, or have physical contacts with, the forum, provided that his efforts 'are purposefully directed' toward forum residents." *Id.* (quoting *Burger King,* 471 U.S. at 476, 105 S.Ct. at 2184); *see also Haisten v. Grass Valley Medical Reimbursement Fund, Ltd.,* 784 F.2d 1392, 1399 (9th Cir.1986) (holding that an out-of-state act having an effect within the forum is sufficient to constitute purposeful availment).

Royal's actual physical contacts with the United States and California are quite limited. As far as the record reveals, they consist of the 24 business trips Bank officials have taken here. However, these physical contacts of themselves do not weigh in favor of an exercise of specific jurisdiction, because Ballard's case against the Bank does not concern the Bank's business trips to America. *See Haisten,* 784 F.2d at 1400 (cause of action must arise out of forum-related activities for specific jurisdiction to attach).

It is undisputed, however, that the Bank has created numerous ongoing obligations to U.S. residents. As noted, more than 60 percent of its customers live in the United States. U.S. residents also are the beneficiaries of millions of dollars of Royal loans. The Bank regularly mails account statements to its U.S. customers, and it at least occasionally solicits new business from them. It also maintains "correspondent accounts" at several major U.S. financial institutions. At least one purpose of these accounts is to give Royal all of "the accessibility of your home bank."

Royal generally does not dispute these contacts. We conclude that the contacts are more than sufficient to establish "purposeful availment." Our opinion in *Haisten* is particularly instructive. There, we faced the question of whether a federal

court in California had specific jurisdiction over a Cayman Islands insurance company. *See* 784 F.2d at 1395. The nonresident company had absolutely no physical contacts with California. It was headquartered in the Cayman Islands and all of its offices and employees were located there. Although it issued malpractice insurance to 22 California physicians, the policies were solicited, issued, delivered, and paid for in the Cayman Islands. The insurance contracts, moreover, were governed by Cayman Island law. We nevertheless found specific jurisdiction appropriate. We concluded that by intentionally insuring California residents, the company had purposefully directed its activities toward California residents. *Id.* at 1398–99 (looking at economic substance rather than form of the defendant's activities). So it is in this case. By intentionally doing business with California and U.S. residents, the Bank "purposefully availed itself of the benefit and privilege of conducting activities in California" and the United States. *See id.* at 1400.

In *Hirsch* we also addressed the question of specific jurisdiction over a nonresident insurance company. There, a Kansas insurance company with no physical ties to California agreed to insure the employees of a Kansas trucking company. 800 F.2d at 1476–77. At the time the insurance contract was signed, the trucking company had employees in several states but none in California. *Id.* Some months later but still during the period covered by the insurance agreement, the trucking company hired three California employees. The California employees filled out their application forms in California and mailed them to the Kansas insurance company. The insurance company accepted the applications and mailed membership materials and other information to the California employees. On the basis of these contacts, we found that the Kansas insurance company had purposefully directed its activities to California. *Id.* at 1480 (finding a "continuing obligation" and "substantial connection" to California residents).

Finally, we take note of the Third Circuit's decision in *Provident Nat'l Bank v. California Fed. Sav. & Loan,* 819 F.2d 434 (3d Cir.1987). There, the Third Circuit ad-dressed the issue of general (as opposed to specific) jurisdiction of a Pennsylvania court over a California bank. Again, the California bank had absolutely no physical contacts with Pennsylvania. Its only connections to Pennsylvania were these: (1) between 700 and 1000 of its more than one million depositors (.066 percent) were Pennsylvania residents; (2) around $10 million of its more than $12 billion in outstanding loans (.071 percent) were traceable to Pennsylvania residents; (3) it maintained a "zero balance" account with Mellon Bank in Pittsburgh to clear its California checks cashed in Pennsylvania; (4) it may *or may not* have purchased mortgages on the open market that were secured by real property in Pennsylvania. *Id.* at 436–37. On the basis of these connections, the Third Circuit found an exercise of *general* jurisdiction appropriate. *Id.* at 438. If the contacts in *Provident Nat'l Bank* were sufficient to satisfy the Third Circuit that personal jurisdiction was appropriate no matter what the cause of action, then the relatively much more substantial contacts in this case certainly would satisfy it that the much lower "purposeful availment" standard for specific jurisdiction was met.

The cases Royal cites are not to the contrary. Its reliance on *Oriental Imports & Exports v. Maduro & Curiel's Bank,* 701 F.2d 889 (11th Cir.1983), is entirely misplaced. As an initial matter, *Oriental Imports* was a diversity case that addressed the question of personal jurisdiction under Florida law. *Id.* at 890. Florida law requires a more substantial connection to the forum state than does the federal Due Process Clause. *Id.* at 890–92. That aside, even if we assume, as *Oriental Imports* decided, that a foreign bank may maintain a "correspondent account" at a local bank without subjecting itself to jurisdiction, Royal did much more than merely keep correspondent accounts in the United States; it purposefully relied on U.S. residents for well over half of its business. The Eleventh Circuit's opinion in *Oriental Imports* is, at best, inapposite to the decision of this case.

█ The same goes for the decision in *E.I.C., Inc. v. Bank of Virginia,* 108 Cal.

App.3d 148, 166 Cal.Rptr. 317 (1980).[4] In that case, the California Court of Appeals faced the question of whether a California court had *general* jurisdiction over a Virginia bank based upon the following two contacts: (1) the Virginia Bank maintained correspondent banking relations with two California banks; and (2) it unknowingly permitted two California residents to open accounts at one of its branches in Virginia. *Id.* 166 Cal.Rptr. at 320. The court held that these connections were not the type of continuous and systematic contacts necessary to support *general* jurisdiction. *Id.* Even assuming that the California decision is persuasive on its own terms, it is not helpful here. For one thing, unlike *Bank of Virginia* here we address specific jurisdiction, which requires a much less substantial connection to the forum. For another, the contacts here are far more substantial than those in *Bank of Virginia*. Not only did Royal depend on U.S. residents for more than half its business, it *knowingly* did so. Under these circumstances, purposeful availment may properly be found. It is only reasonable for a foreign bank that depends on the United States for its daily bread to expect that it one day may be haled into court here. *See Haisten,* 784 F.2d at 1400. We so hold.

### B.

■ We rely on a "but for" test to determine whether a particular claim arises out of forum-related activities and thereby satisfies the second requirement for specific jurisdiction. *See Shute v. Carnival Cruise Lines,* 897 F.2d 377 (9th Cir.1990), *rev'd on other grounds* 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991). Although the Supreme Court reversed the Ninth Circuit's decision in *Shute,* it did not reject the "but for" test. It appears that the test has survived. *See Loral Terracom v. Valley National Bank,* 49 F.3d 555, 561 (9th Cir.1995); *but cf.* Flavio Rose, Note, Related Contacts and Personal Jurisdiction: The "But For" Test, 82 Cal. L.Rev. 1545 (1994) (criticizing our "but for" test).

4. California permits its courts to exercise personal jurisdiction to the extent permitted by the federal due process clause. *See Hirsch,* 800 F.2d at 1477. Although California decisions constru-

■ The question, therefore, is this: but for Royal's contacts with the United States and California, would Ballard's claims against the Bank have arisen? Ballard answers this question in the affirmative. She argues that if Royal had not done business in the United States, she would have no claim against it, because in the absence of Royal's American banking network, Mr. Savage would not have opened an account at the Bank and filled it with ill-gotten funds. This logic seems sound. Given that Royal does not dispute it, we conclude that Ballard has carried her burden on the issue.

### C.

■ The third requirement is that an exercise of jurisdiction must be reasonable. We presume that an otherwise valid exercise of specific jurisdiction is reasonable. *See Sher v. Johnson,* 911 F.2d 1357, 1364 (9th Cir.1990) (once court finds purposeful availment, it must presume that jurisdiction would be reasonable). The burden of convincing us otherwise is on Royal. To avoid jurisdiction, Royal must "present a *compelling case* that the presence of some other considerations would render jurisdiction unreasonable." *Burger King,* 471 U.S. at 477, 105 S.Ct. at 2185 (emphasis added); *Haisten,* 784 F.2d at 1397, 1400. In our view, Royal has not carried its heavy burden of rebutting the strong presumption in favor of jurisdiction. *See Sher v. Johnson,* 911 F.2d at 1364 (identifying factors court should consider in evaluating reasonableness of jurisdiction).

### 1.

We first consider the extent to which Royal has purposefully availed itself of the privilege of doing business in the United States. *See Core–Vent Corp. v. Nobel Industries AB,* 11 F.3d 1482, 1488 (9th Cir.1993). We conclude that the purposeful availment in this case is considerable. It is indisputable that Royal depends upon the United States for a substantial portion of its business. It not

ing the Due Process Clause obviously are not controlling, Royal cites, and we discuss, *Bank of Virginia* because we sometimes find California decisions instructive. *See id.* at 1480 n. 4.

only takes deposits from U.S. residents, it loans them millions of dollars each year. It also maintains "correspondent accounts" in the United States that it relies upon, at least in part, to conduct business with its U.S. customers. Finally, it regularly corresponds with its customers here; in fact, it even solicits new business from them. These facts are undisputed. When considered together, they add up to considerable "availment" and tilt heavily toward a finding of reasonableness.

**2.**

We next consider the forum state's interest in adjudicating this dispute. *See Haisten,* 784 F.2d at 1401. Royal admits that the United States and California have an interest in protecting their citizens against the type of fraudulent conduct alleged in this case. We agree, as did the district court. This factor weighs in Ballard's favor.

**3.**

We now consider whether an exercise of jurisdiction would conflict with Austria's sovereignty. Although this factor is important, *see Asahi Metal Industry Co. v. Superior Court,* 480 U.S. 102, 114, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987), it is by no means controlling. *See Gates Learjet Corp. v. Jensen,* 743 F.2d 1325, 1333 (9th Cir.) ("[I]f [this factor were] given controlling weight, it would always prevent suit against a foreign national in a United States court."), *cert. denied,* 471 U.S. 1066, 105 S.Ct. 2143, 85 L.Ed.2d 500 (1985).

■ An exercise of jurisdiction over the Bank necessarily would implicate Austria's sovereignty interest. *See FDIC v. British–American Ins. Co.,* 828 F.2d 1439, 1444 (9th Cir.1987). Royal does not stop there however. It further urges that we should reject personal jurisdiction out of "international comity." It bases its plea on the clash of substantive law it thinks will occur if this case proceeds. However, the Bank's argument misses the point. Any clash between the forum law and the substantive policies of

another state must be resolved through traditional choice of law rules and not on the basis of personal jurisdiction. *Haisten,* 784 F.2d at 1402 (citing *Burger King,* 471 U.S. at 477, 105 S.Ct. at 2184–85).

Although we reject Royal's invitation to decline jurisdiction on the basis of "international comity," we nevertheless agree with Royal and the district court that an exercise of jurisdiction would implicate Austria's sovereignty interest. Accordingly, this factor weighs in Royal's favor.

**4.**

Another important consideration is whether Royal will be burdened by having to come defend itself in California. *See Asahi,* 480 U.S. at 114, 107 S.Ct. at 1033; *Hirsch,* 800 F.2d at 1481. Royal claims that having to travel to San Diego to defend itself in a foreign judicial system would be extremely burdensome. However, it has not presented any evidence on the extent of the burden.[5] We cannot answer the question in the abstract. We only note, as the court in *Hirsch* observed, that the advent of "modern transportation" certainly has made the burden of defending in a foreign forum more palatable. *See* 800 F.2d at 1481. This of course is not to suggest that defending in California would place no burden at all on Royal. Certainly, it would be an inconvenience. But unless the "inconvenience is so great as to constitute a deprivation of due process, it will not overcome clear justifications for the exercise of jurisdiction." *Roth v. Garcia Marquez,* 942 F.2d 617, 623 (9th Cir.1991). Royal has made no showing as to the severity of its burden. Under these circumstances, we conclude that this factor weighs in favor of Royal, but only slightly.

**5.**

The next two factors are easy. We must consider (a) which forum could most efficiently resolve this dispute and (b) where Ballard

---

5. The burden is on Royal to show that jurisdiction would be unreasonable. *See Haisten,* 784

F.2d at 1397.

could obtain the most effective and convenient relief. As the district court concluded, the most efficient resolution of this dispute would be in the Southern District, since the court there already is familiar with the facts and procedural history of the litigation. Also, Ballard could obtain the most effective and convenient relief in California, as the district court properly concluded. *Id.* Both of these factors weigh in Ballard's favor.

6.

The final consideration is whether there exists an alternate forum. Royal claims that an Austrian court could hear Ballard's claims, but it presents absolutely no evidence on this issue, erroneously assuming that the burden is on Ballard to prove the lack of an alternate forum. Although we assume that Austria would provide Ballard some sort of forum, whether the forum would be adequate is impossible to say on the record as it now stands. This factor weighs in Ballard's favor.

In fine, Royal has not carried its heavy burden of presenting a "compelling case" against jurisdiction. *See Burger King,* 471 U.S. at 477, 105 S.Ct. at 2184–85; *Haisten,* 784 F.2d at 1397, 1400. We can only conclude therefore that an exercise of personal jurisdiction over Royal would be reasonable. Because we conclude that the district court had specific jurisdiction over Royal as to all claims, we do not address the question of whether it also had general jurisdiction.

**REVERSED** and **REMANDED.**