**QUOKKA SPORTS, INC., Plaintiff,**

v.

**CUP INT'L LTD., Cup Int'l Internet Ventures, Arron John Brett, Justin Nicholas, and Does 1–50 Defendants.**

No. C–99–5076–DLJ.

United States District Court, N.D. California.

Dec. 13, 1999.

Adam C. Belsky, Gross & Belsky, San Francisco, CA, for Plaintiff.

Bret A. Fausett, Dominica C. Anderson, Hancock Rothert & Bunshoft LLP, San Francisco, CA, Neil A. Smith, Limbach & Limbach LLP, for Defendants.

## SUPPLEMENTAL ORDER

JENSEN, District Judge.

On December 8, 1999, the Court heard argument on plaintiff's motion for a temporary restraining order (TRO). Terry Gross appeared on behalf of plaintiff; there was no appearance for defendants. Neil Smith appeared on behalf of Network Solutions, Inc. (NSI), although NSI was dismissed as a defendant just prior to the hearing.[1] On December 9, 1999, the Court granted plaintiff's request for a TRO and set a schedule for the preliminary injunction hearing. This supplemental order provides a more detailed explanation of the Court's reasoning in support of the December 8, 1999 Order.

## I. BACKGROUND

A. *Factual Background and Procedural History*

The essence of plaintiff's complaint is one of trademark infringement based on defendants' registration and use of the domain name americascup.com. Plaintiff claims to have the exclusive rights to operate the official website connected with the sailing event known as the America's Cup. Plaintiff currently operates a website at americascup.org. The First Amended Complaint (hereafter, Complaint) has eight claims: (1) trademark infringement, 15 U.S.C. § 1114(1); (2) unfair competition and false designation of origin, 15 U.S.C. § 1125(a); (3) trademark dilution, 15 U.S.C. § 1125(c); (4) common law unfair competition; (5) unfair competition, Cal. Bus. & Prof.Code § 17200; (6) California Anti–Dilution Statute, Cal. Bus. & Prof. Code § 14330; (7) false advertising, Cal. Bus. & Prof.Code § 17500; and (8) Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d). The Anticybersquatting Consumer Protection Act was signed into law on the same day as this complaint was filed, November 29, 1999.

America's Cup Properties Inc. (ACPI) is the holder of the trademark "America's Cup," and all other intellectual property relating to the America's Cup event. *See* Second Ramadan Decl. Ex. A at 2. The marks are registered in the United States Patent and Trademark Office (PTO) and in other countries, including New Zealand. *See* Chapman Decl. ¶ 6–9, Ex. A, B, C. Procedurally, the shares of ACPI are transferred to the winner of the America's Cup event. *See* Chapman Decl. ¶ 4. Thus, in 1996 after the successful challenge by Team New Zealand, the share of ACPI, and the rights associated with the "America's Cup" marks, passed to the Royal New Zealand Yacht Squadron. *See id.* The Royal New Zealand Yacht Squadron licensed the marks to its subsidiary, AC 2000 Limited, a New Zealand Company. *See* Second Ramadan Decl. Ex. A at 1.

In December 1996, AC 2000 gave an exclusive license to Telecom New Zealand

---

**1.** Since NSI is no longer a defendant, and Does 1–50 remain unidentified, all references herein to defendants refer to the Cup International defendants.

Limited (Telecom NZ) to operate the official's America's Cup website. *See* Chapman Decl. ¶ 17. In April 1997, Telecom NZ registered five different domain names: americascup2000.org.nz, americascup2000.co.nz, amcup2000.org.nz, amcup2000.co.nz, and teamnz .org.nz. *See id.* at ¶ 18. Apparently, Telecom NZ did not register any ".com" addresses, but instead limited itself to ".nz" addresses.

In February 1999, ACPI and AC 2000 became aware of defendants' website and ownership of the americascup.com domain name. *See id.* at ¶ 23. They became aware of it because Arron Brett, director of Cup International, sent an email that was brought to the attention of ACPI and AC 2000. *See id.* The email stated:

> We are the owners of the domain names teamnewzealand.com and americascup.com[.] We are an Auckland based Company and we are rapidly developing both of these sites to prepare for the huge volume of traffic expected for the Cup. *As you can appreciate the rule that applies to real estate applies to the web—location, location, location. Both of these .com domain names are best addresses especially for the lucrative American market.* My colleague informs me that you made enquiry some time last year of the address teamnewzealand.com. We would like to meet with you to outline our plans for these sites and discuss with you the interest you have in this domain name for Line7. I will call you shortly. If you would like to contact me quickly my mobile number is 021 217 1057
> Kind Regards
> Arron Brett
> Director
> for Cup International Limited

*Id.* Ex. D (emphasis added). After receipt of this email, ACPI and AC 2000 investigated defendants' website and found that in their opinion, the website at americascup.com was masquerading as the official website. *See id.* at ¶ 24–25. A series of letters ensued between counsel for both sides. *See id.* at ¶ 26–28, Ex. E, F, G. Some alterations were made to the website at americascup.com, but defendants' position remained that they were not infringing any valid America's Cup marks, and in particular, that the New Zealand marks were invalid. *See id.* at Ex.G at 1–2. Defendants' believed the America's Cup name to be in the public domain, and made reference to a 1987 decision by an Australian Hearing Officer in support of this claim. *See id.* at 2, Ex.I at 2–3.

In April 1999, AC 2000 signed a license agreement with plaintiff Quokka to operate the official America's Cup website. *See id.* at ¶ 20, *see also* Second Ramadan Decl. Ex.A. While Telecom NZ was not a party to that license, they apparently sub-licensed their Internet rights to plaintiff under a separate agreement (the "Website Agreement"). *See* Second Ramadan Decl. Ex.A at 1–2. Additionally, the parties apparently entered into another agreement referred to as the "Domain Name Agreement." *See id.* Quokka is a Delaware corporation having its principal place of business in San Francisco, California. *See id.* at 1.

After the April license, further discussion ensued between ACPI, AC 2000, and defendants. *See* Chapman Decl. at ¶ 32–38. This included initiation of the NSI domain name dispute resolution process. *See id.* As part of that process, the defendants were given until November 6, 1999 to respond. *See id.* at ¶ 37. On November 3, 1999, defendants filed suit in New Zealand to invalidate the New Zealand "America's Cup" trademarks and for a declaratory judgment of noninfringement of those same marks. *See id.* Ex.L. On November 24, 1999, ACPI and AC 2000 countersued in New Zealand alleging, essentially, that defendants had infringed the New Zealand "America's Cup" trademarks. *See id.* Ex.M. The Court notes that both of these actions appear to involve solely the New Zealand registrations, and not the U.S. PTO registrations.

In late November, Quokka began the process of initiating the current lawsuit. Negotiations ensued between counsel for Quokka and New Zealand counsel for defendants. *See* Gross Decl. ¶ 12–19. As part of these negotiations, defendants agreed to remove the website at americascup.com and to not recommence using it without seven days notice. *See id.* ¶ 14, Ex. N. Plaintiff requested additional terms, particularly that defendants not transfer or assign the domain name, and that they place a notice on www.americascup.com stating that he official website was located at www.americascup.org. *See id.* ¶ 16. Defendants would not agree to those terms. Plaintiff filed the current action on November 29, 1999. As the current action invokes federal trademark infringement under the Lanham Act, the Court is interpreting it as being based on the marks registered with the U.S. PTO, and not on the New Zealand marks.

Concurrent with the filing of the complaint, plaintiff filed an ex parte motion for a TRO and a preliminary injunction. The Court issued an order on November 29, 1999, setting a briefing schedule and a hearing for December 8, 1999. The Court was motivated in part by a preference to have a response from defendants in lieu of proceeding ex parte. Subsequently, the motion and all other filed pleadings were served on defendants, and on the purported American counsel for defendants. The identified American counsel was ultimately not retained by defendants, and defendants made no appearance at the hearing on December 8, 1999. The motion for a TRO is now before the Court.

**B.** *Legal Standard*

Under Federal Rule of Civil Procedure 65(b)

A temporary restraining order may be granted without written or oral notice to the adverse party or to that party's attorney if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required.

Fed.R.Civ.P. 65(b).

 To obtain injunctive relief plaintiff must show either (1) a combination of probable success on the merits and the possibility of irreparable harm, *or* (2) that serious questions are raised and the balance of hardships tips sharply in the moving party's favor. *See Roe v. Anderson,* 134 F.3d 1400, 1402 (9th Cir.1998). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Id.* However, in any situation, the Court must find that there is some threat of immediate irreparable injury, even if that injury is not of great magnitude. *See Big Country Foods, Inc. v. Board of Educ. of Anchorage School District,* 868 F.2d 1085, 1088 (9th Cir.1989) (citing cases); *Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.,* 762 F.2d 1374, 1376 (9th Cir.1985) (citing cases). In cases involving trademark infringement, irreparable injury is presumed upon a demonstration of likelihood of success on the merits. *See Vision Sports Inc. v. Melville Corp.,* 888 F.2d 609, 612, n. 3 (9th Cir.1989).

 To prevail on its trademark infringement action, plaintiff must demonstrate (1) ownership of an enforceable right in a trademark and (2) that defendants' use of the mark creates a likelihood of consumer confusion. *See Levi Strauss & Co. v. Blue Bell, Inc.,* 778 F.2d 1352, 1354 (9th Cir.1985) (en banc). In determining whether or not there is a likelihood of confusion, the Court is to weigh the following factors: (1) the strength of the mark; (2) proximity of the goods; (3) simi-

larity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. *See AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir.1979).

## II. DISCUSSION

### A. *Personal Jurisdiction*

The issue of personal jurisdiction in cases alleging trademark infringement via domain names is increasingly common in the federal courts. *See Millennium Enterprises, Inc. v. Millennium Music, LP*, 33 F.Supp.2d 907, 913–20 (D.Or.1999) (reviewing or citing over 30 cases dealing with jurisdiction and the Internet). The majority of these cases deal with whether a nonresident of one state can be subject to personal jurisdiction in another state based on Internet activities. These cases involve, for instance, whether it comports with due process to subject a South Carolina resident to the personal jurisdiction of the Oregon courts. *See id.* at 908.

This case goes one step further, and addresses whether foreign defendants can be subjected to personal jurisdiction in the United States based on their Internet activities. Specifically, whether corporate and individual defendants in New Zealand can be subject to personal jurisdiction in California for trademark infringement claims involved a disputed domain name. Based on the facts and circumstances in this case, we find that they can.

Personal jurisdiction can be asserted over a foreign defendant if permitted by California's long-arm statute and if doing so will not violate federal due process. *See Fireman's Fund Ins. Co. v. National Bank of Cooperatives*, 103 F.3d 888, 893 (9th Cir.1996). California's long-arm statute permits the assertion of jurisdiction on any basis not inconsistent with the state or federal constitutions. *See* Cal. Civ. P. § 410.10. The jurisdiction of Cali-

fornia courts is coextensive with the outer limits of due process under the state and federal constitutions, as those limits have been defined by the United States Supreme Court. *See Threlkeld v. Tucker*, 496 F.2d 1101, 1103 (9th Cir.1974). For due process to be satisfied, a defendant, if not present in the state, must have minimum contacts with the forum state such that the assertion of jurisdiction "does not offend traditional notions of fair play and substantial justice." *See International Shoe Co. v. State of Washington*, 326 U.S. 310, 315, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

Additionally, in some circumstances jurisdiction is proper when a defendant's aggregated contacts with the United States, but not the contacts with any single state, satisfy constitutional criteria. Nationwide aggregation of a defendant's contacts is proper if the defendant is sued under a federal statute authorizing worldwide service of process. *See Go-Video Inc. v. Akai Elec. Co.*, 885 F.2d 1406, 1414 (9th Cir.1989). The federal statute at issue here, the Lanham Act, contains no express provision for extraterritorial service of process. *See, e.g., Webster Dictionary Corp. v. Ginzburg*, 70 F.R.D. 412, 413 (N.D.Ill.1975). However, the 1993 amendments to Rule 4 of the Federal Rules of Civil Procedure permit nationwide aggregation for cases brought under federal law in federal court unless (1) the defendant is subject to the jurisdiction of the courts of general jurisdiction of any state or (2) expressly forbidden by statute. *See* Fed. R.Civ.P. 4(k)(2); *World Tanker Carriers Corp. v. M/V Ya Mawlaya*, 99 F.3d 717 (5th Cir.1996) (allowing aggregation of contacts under Rule 4(k)(2) for suit brought under admiralty law); *Minebea Co. v. Papst*, 13 F.Supp.2d 35, 42 n. 6 (D.D.C.1998) (noting personal jurisdiction via aggregation under Rule 4(k)(2) for Lanham and patent claims). The Lanham Act does not forbid aggregation of contacts for jurisdiction purposes. As defendants have made no assertion that they are subject to the general jurisdiction of any state,

nor does any such jurisdiction appear likely to the Court based on the evidence submitted, the aggregation of Rule 4(k)(2) applies.[2]

The Ninth Circuit applies a three-part test to ascertain whether the assertion of jurisdiction comports with due process. *See Ballard v. Savage*, 65 F.3d 1495 (9th Cir.1995). Each of these prongs will be addressed below.

### 1. *Purposeful Availment*

First, the defendant must have taken steps to "purposefully avail" itself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of the forum and having "fair warning" that a particular activity may subject it to jurisdiction. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Purposeful availment is demonstrated when the defendant has taken deliberate action within the forum state or created continuing obligations to residents of the forum state. *See Ballard*, 65 F.3d at 1498. A defendant need not be physically present within the forum, provided its efforts are purposefully directed toward forum residents. *See Burger King*, 471 U.S. at 476, 105 S.Ct. 2174.

■ In the context of contacts involving the Internet, the Ninth Circuit has applied a "sliding scale" under which jurisdiction is directly proportionate to the nature and quality of defendant's commercial activity conducted on the Internet. *See Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 418 (9th Cir.1997) (quoting *Zippo Mfg. v. Zippo Dot Com, Inc.*, 952 F.Supp. 1119, 1123 (W.D.Pa.1997)). Simply registering someone else's trademark as a domain name and maintaining a presence on the Internet is insufficient to subject a defendant to jurisdiction in plaintiff's home state. *See id.* Something more than maintaining a

website is required to indicate purposeful activity directed towards the forum state. *See Panavision Int'l. L.P. v. Toeppen*, 141 F.3d 1316, 1321 (9th Cir.1998).

■ In *Panavision*, the court found purposeful availment where the defendant registered the contested domain as part of a scheme to obtain money and offered to sell the domain to plaintiff. *See id.* at 1318. In a software infringement suit discussed by the Ninth Circuit in *Cybersell*, the Sixth Circuit found the defendant had reached out to the forum state by contractually signing up for a subscription Internet service based in the forum state and transmitting his product to the plaintiff in the forum state via the Internet for distribution. *See Cybersell*, 130 F.3d at 417 (citing *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1264 (6th Cir.1996)). In addition, the defendant in *CompuServe* made sales in the forum state and funds were transmitted through the forum state to the defendant. *See CompuServe*, 89 F.3d at 1264.

On the other hand, the Ninth Circuit has declined to find jurisdiction where the defendant maintained an essentially passive or non-interactive website, did nothing to encourage people in the forum state to access it, conducted no business in the forum state, and made no sales or contracts there. *See Cybersell*, 130 F.3d at 419–20. The *Cybersell* court declined to find jurisdiction even though the website at issue allowed Internet users to sign up, list their address, indicate interest in defendant's services, and included a local telephone number. *See id.*

It is clear to the Court that in this case defendants aimed a significant portion of their commercial effort at the United States. Unlike Telecom NZ, which registered domain names under ".nz," the defendants purposefully went to the United

---

**2.** Plaintiff asserts in a footnote that defendants have satisfied the general jurisdiction requirements of California. *See* Pl. Mem. at 6 n. 4. The Court, at this stage, remains unconvinced. However, even if such general jurisdiction were to be found, the result would be the same: defendants would be subject to personal jurisdiction in California.

States registrar, NSI, to get a ".com." Defendants admitted that they sought out a specific domain name to target the "lucrative American market." Chapman Decl. Ex.E. They did so knowing the importance, as they put it, of "location, location, location." *Id.*

The defendants apparently targeted the U.S. market because there is substantial interest in the America's Cup in the U.S. Of the 11 challenging teams, five are from the United States. Three of these teams are from California. The previous holder of the cup was the San Diego Yacht Club, and the previous races were off the California coast. Plaintiff notes that for its own website at americascup.org, over 50% of the traffic originates from the United States, and over 50% of their sales are to U.S. consumers. *See* Ramadan Decl. ¶ 18.

The content of the americascup.com website reflected the defendants' intention to target the U.S. market. Because the website is no longer operating, plaintiff submitted printed pages showing sections of defendants' website. *See* Chapman Decl. Ex. N. Because defendants have declined to respond, the Court has no choice but to take these pages as true and make all likely related inferences. Plaintiff provided a list of ten U.S. companies that advertised on the defendants' website. *See* Gross Decl. ¶ 5. These companies placed the now familiar "banner ads" that encourage a consumer to "click through" and visit the advertiser's website. *See* Chapman Decl. Ex. N. These U.S. companies have addresses in Georgia, Texas, Washington, Ohio, South Dakota, California, New York, Florida and Maryland. *See id.* Some of these companies, for instance Bankrate.com, provide services only in the United States and Puerto Rico. *See id.* Further, when a consumer selects the advertisement for Dell Computers, the page that is displayed to the consumer is only for consumers in the United States.

*See id.* The Court realizes that Dell, not the defendants, chose what page the advertisement retrieved, but clearly, it is evidence that Dell believed it could target the U.S. market via the defendants' website.

Further, plaintiff provides a series of emails documenting how a San Francisco merchant negotiated a possible advertisement on defendants website.[3] *See* Campa Decl. Ex.B. The executive vice president of BravoGifts.com requested information on website advertising, and was quoted a price in U.S. dollars. *See id.* The Court can only surmise that the defendants executed a similar process in negotiating and ultimately entering into contracts with the other U.S. companies.

The website also contains a travel section that offers cruises along the race course. *See* Chapman Decl. Ex. N. Consumers can fill out an online order form, including entering a credit card, and purchase a travel package. All the pricing is given in U.S. dollars. There are no options, examples or information of any kind on how to convert the prices in U.S. dollars to any other currency. Moreover, the website includes an "America's Cup Bookstore" which invites the consumer to browse and order online one of the recommended sailing books. *See id.* This bookstore is apparently in conjunction with Amazon.com.

The Court finds this type of interactive commercial activity, aimed at U.S. consumers, to be evidence of purposeful availment. This website is not like the passive website the Ninth Circuit found in *Cybersell. See Cybersell*, 130 F.3d at 419–20. Here, the defendants are essentially operating as a storefront, selling services and products, and entering into contracts with U.S. advertisers. The Court finds the first jurisdictional test, purposeful availment, to be satisfied.

**3.** While plaintiff did not specify that Bravo-Gifts.com was a San Francisco company, the Court took the liberty of viewing www.bravo- gifts.com and noting the company's address in San Francisco.

### 2. Arising Out of Forum–Related Activities

Second, the claim must arise out of or result from defendant's forum-related activities. *See Ballard,* 65 F.3d at 1498. A claim "arises out of" if injury to the plaintiff would not have occurred "but for" the defendant's forum related activity. *See id.* at 1500; *Panavision,* 141 F.3d at 1322.

The Court finds that this test is satisfied as well. The harm to Quokka's U.S. trademark rights would not have occurred but for the defendants' operation of a website aimed at U.S. consumers.

### 3. Reasonableness

■ Third, the assertion of jurisdiction must be reasonable. *See Panavision,* 141 F.3d at 1322. To be reasonable, the assertion of jurisdiction must comport with "fair play and substantial justice." *See Burger King,* 471 U.S. at 476, 105 S.Ct. 2174. The factors to be balanced when considering reasonableness are 1) the extent of defendant's purposeful interjection; 2) the burden on the defendant in defending in the forum; 3) the extent of conflict with the sovereignty of the defendant's state; 4) the forum state's interest in adjudicating the dispute; 5) the most efficient judicial resolution of the controversy; 6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and 7) the existence of an alternative forum. *See id.* at 476–77, 105 S.Ct. 2174.

■ The Ninth Circuit has held that where a defendant has purposefully availed himself of the privileges of a forum, it is likely to be reasonable to exercise jurisdiction. "[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Core–Vent Corp. v. Nobel Industries AB,* 11 F.3d 1482, 1487 (9th Cir.1993) (citing *Burger King,* 471 U.S. at 476–77, 105 S.Ct. 2174). The burden is on defendants to present a compelling case that jurisdiction is unreasonable. Defendants have failed to appear and thus fail to carry their burden. In the light of completeness, the Court will nevertheless review the factors.

#### a. Purposeful interjection

This factors tips in favor of plaintiff. The Court finds the defendants to have purposefully interjected their website into the California and United States markets.

#### b. Burden on the defendant in defending in the forum

Here, this factors tips in favor of defendants. Defendants are a corporation and individuals in New Zealand. In addition to the travel burden, the substantive and procedural laws of New Zealand are not identical to those in California. This is different from many other domain name cases, where federal trademark law and federal procedure are unvaried from state to state.

#### c. Extent of conflict with the sovereignty of the defendants' state

Because defendants' have failed to appear, the Court has no information concerning the conflict between the sovereignty concerns of the United States and New Zealand. Thus, the Court must tip this factor in favor of plaintiff.

#### d. Forum state's interest in adjudicating the dispute

Here, California and the United States have significant interests in adjudicating the dispute. The action focuses on U.S. trademarks rights, and requires the application of federal law. Quokka, who has the license to the U.S. marks, is a California company. This factor tips in favor of plaintiff.

#### e. Efficient judicial resolution of the controversy

This factor focuses on the availability of evidence and witnesses. The Ninth Circuit

has noted that this factor is no longer weighted heavily given the modern advances in communication and transportation. *See Panavision,* 141 F.3d at 1323. The Court finds this factor to favor neither plaintiff nor defendants.

f. *Importance of the forum to the plaintiff's interest in convenient and effective relief*

This factor tips in favor of plaintiff. Plaintiff is seeking an application of U.S. trademark law to correct alleged offenses to U.S. trademarks. To force plaintiff to litigate in a non-federal forum, for instance in New Zealand, would put a considerable burden on plaintiff, not to mention the New Zealand judiciary.

g. *Existence of an alternative forum*

This factor also tips in favor of plaintiff. Defendants have not shown that any other forum, in New Zealand or another U.S. state, is available. The United States has a strong interest in adjudicating its own laws as they affect its own citizens. Defendants do not appear to be subject to general jurisdiction anywhere in the United States, and as such their United States contacts are aggregated under Rule 4(k)(2). California has more ties to defendants than any other single state, and is the most logical place for jurisdiction to rest.

In sum, the Court finds that it is not unreasonable to exercise personal jurisdiction over defendants, as they have purposefully availed themselves of the U.S. market, and their conduct is the cause of plaintiff's alleged injury.

4. *Individual Defendants*

■ The Court makes a preliminary finding that it has jurisdiction over the individual defendants as well as the corporate defendants. The two individual defendants are apparently the only two

shareholders of Cup International Limited. *See* Chapman Decl. ¶ 57, Ex. P. Brett and Nicholas are also Cup's directors. *See id.* Both appear to be personally involved in the activities of operating and developing the americascup.com website. Brett sent the email stating his intention to target the lucrative American market. *See id.* Ex. E. Nicholas sent the emails concerning the availability of advertising space to the San Francisco company BravoGifts.com. *See* Campa Decl. Ex. B. As the Supreme Court has noted, "their status as employees does not somehow insulate them from jurisdiction." *Calder v. Jones,* 465 U.S. 783, 790, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984); *see also Gordy v. Daily News L.P.,* 95 F.3d 829, 832–33 (9th Cir.1996) (finding personal jurisdiction); *but see Casualty Assurance Risk Ins. Brokerage Co. v. Dillon,* 976 F.2d 596 (9th Cir.1992); *Core–Vent Corp. v. Nobel Industries AB,* 11 F.3d 1482 (9th Cir.1993). Based on the individual defendants apparent control over all the corporate defendants' contacts with California and the United States, the Court finds it has personal jurisdiction over the individual defendants as well.

B. *Success on the Merits and Irreparable Harm*

The Court finds that plaintiff has made a sufficient showing of a reasonable likelihood of success on the merits of its claim that defendants' operation of the website at www.americascup.com infringes upon and violates plaintiff's trademark rights.[4] Further, the Court finds that plaintiff will suffer irreparable harm if a TRO is not issued.

1. *Enforceable Right in the Mark*

■ The Court finds that plaintiff Quokka Sports has the right to enforce the subject trademarks of America's Cup Properties Inc. (ACPI) as related to the

---

**4.** The Court bases its findings on plaintiff's claim of trademark infringement. The Court declines at this time to examine whether

plaintiff has a similar likelihood of success on its other claims.

websites at issue here. Quokka, by virtue of its license with AC 2000, and with AC 2000's consent, has the authority to maintain this action and to act as the legal representative of ACPI and AC 2000. *See* Second Ramadan Decl. Ex.A. ¶ 5.2(d). Scott M. Chapman, an executive director of both ACPI and AC 2000, has submitted an extensive declaration in this action and gives his authority for Quokka to maintain the action. *See* Chapman Decl. ¶ 1, 41. The Court finds that Quokka, as the legal representative of ACPI and AC 2000, is an adequate plaintiff such that complete relief concerning the subject trademarks can be accorded by the Court.

Further, the Court makes its current findings with respect to the U.S. trademarks currently held by ACPI; specifically, the marks identified in Chapman Decl. Ex.A. The Court is unaware of any challenges to the validity of these marks. The Court makes no findings as to the status or enforceability of any marks registered elsewhere, particularly the New Zealand marks.

#### 2. *Likelihood of Consumer Confusion*

The Court finds that the operation of the website at www.americascup.com is likely to cause consumer confusion. The website appears for all intents and purposes to be masquerading as an official site associated with the America's Cup event. The domain name americascup.com is virtually identical to the registered mark "America's Cup." The same type of information is offered at both americascup.com and americascup.org. *See Brookfield Communications v. West Coast Entertainment Corp.,* 174 F.3d 1036, 1053–61 (9th Cir. 1999) (finding moviebuff.com similar to mark MovieBuff); *Interstellar Starship Services Ltd. v. Epix Inc.,* 184 F.3d 1107, 1110–12 (9th Cir.1999) (finding epix.com similar to mark EPIX).

#### 3. *Irreparable Harm*

In trademark actions, there is a presumption of irreparable harm when there is a demonstration of likelihood of success on the merits. *See Metro Publishing, Ltd. v. San Jose Mercury News,* 987 F.2d 637, 640 (9th Cir.1993). Here, plaintiff has shown that the value of its marks is being harmed by defendants' website, notably the linking of casinos and gambling to the America's Cup event. *See* Chapman Decl. ¶ 67. Plaintiff Quokka further alleges harm based on diversion of traffic away from the official website. *See* Ramadan Decl. ¶ 13, 14. The Court finds that plaintiff has demonstrated the likelihood of irreparable harm.

### III. CONCLUSION

Based on the above reasoning, the Court GRANTED plaintiff's request for a TRO against defendants, the terms of which were stated in the Order of December 8, 1999.

IT IS SO ORDERED.